**In re JOY RECOVERY TECHNOLOGY CORPORATION, Debtor.**

**Noel Daley, not individually, but solely as Trustee for the Joy Recovery Technology Corporation Liquidation Trust, Plaintiff,**

v.

**Mark J.F. Chang and Cathy C.H. Chang, Defendants.**

**Bankruptcy No. 97 B 36491.**
**Adversary No. 98 A 02044.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Jan. 5, 2001.

Christopher J. Horvay, Gould & Ratner, Chicago, IL, for plaintiff.

Scott N. Schreiber, Much Shelist, etc., Chicago, IL, for defendant.

## MEMORANDUM OPINION

JACK B. SCHMETTERER,
Bankruptcy Judge.

Noel H. Daley, not individually but as Trustee for the Joy Recovery Technology Corporation Liquidation Trust ("Trustee,") filed this adversary proceeding against, Mark J.F. Chang ("Chang") and Cathy C.H. Chang[1] (together "the Changs") in relation to the Chapter 11 bankruptcy case of Joy Recovery Technology Corporation[2] ("Joy.") The complaint seeks to recover

1. Nick Young was originally included as a defendant, but was subsequently dismissed with prejudice.

2. Beginning in 1995 Joy originally consisted of the following companies: Joy Recovery Technology Corporation; Joy CRC–Illinois, Inc.; Joy MRC–Illinois, Inc.; Joy MRC–Massachusetts, Inc.; Joy MRC, Inc.; Joy MRC–Indiana, Inc.; Novatrend Corporation; Trendco, Inc.; Joy MRC–Colorado, Inc.; and Joy MRC–Pennsylvania, Inc. Those companies

assets used to acquire the Changs' interest consisting of common stock in Joy.

Joy's main business was processing and brokering scrap metals. The Chang family originally held 50% of common stock issued by Joy[3]. Chang was an officer and director of the company until the sale of the Changs' stock in December 1995.

In Counts I and II of the Adversary Complaint, the Trustee prays for avoidance and recovery of the $2.1 million paid to the Changs for the sale of their stock as an assertedly fraudulent transfer under 11 U.S.C. §§ 544 and 550 and 740 ILCS 160/5 and 160/6. In Counts III, IV and V the Trustee pleaded state common law claims seeking damages in the amount of $2.1 million. The Complaint alleges that the Changs as stockholders, and Chang as an officer and director, breached their fiduciary duties to Joy and misappropriated corporate assets when they sold their stock.

The Changs moved for summary judgment on all counts of the Trustee's Complaint. For reasons stated herein and by separate order the Changs' motion is entirely denied, and the case will be set for trial.

## I. BACKGROUND

### A. Local Bankruptcy Rule 402

Local Bankruptcy Rule 402 sets forth the procedural requirements of a motion for summary judgment. It requires that the moving party submit a statement of material facts to which that party contends there is no genuine issue and that are asserted to entitle the party to judgment as a matter of law. 402.M[4]. The nonmoving

are referred herein to collectively as Joy Recovery Technology Corporation or "Joy."

3. Chang's mother owned a small amount of stock, the stock of one company was owned in the name of Cathy Chang, and the remaining portion of the Chang stock in Joy was owned in the name of Mark Chang.

4. Rule 402.M provides:

Motions for summary Judgment; Moving Party

party must submit responses to the facts set forth by the moving party, as well as any material facts to which the nonmoving party contends there is no genuine issue and which support a denial of the motion for summary judgment. 402.N [5]. In setting forth their facts and contesting facts set forth by the opposing party, each party must include specific references to the affidavits, parts of the record, and other supporting materials relied upon in the statement made. All material facts thus set forth are deemed admitted unless controverted with specificity and reference to proper supporting materials. Local Bankr.R. 402. Materials that may be referred to, apart from admissions in the pleadings, are those authorized by he material rule pertaining to summary judgment procedure. Fed.R.Bankr.P. 7056.

 The requirements of Local Rule 402 are important to help the court determine exactly which facts are material and which are in dispute. *Banner Oil Co. v.*

*Bryson (In re Bryson)*, 187 B.R. 939, 944 (Bankr.N.D.Ill.1995). When Local Rule 402 is properly complied with, the required submissions point precisely to the portions of the record relied on by each party and enable efficient review by the Court in order to resolve the motion. *Banner*, 187 B.R. 939 at 944. Strict compliance with Local Rule 402 is necessary. An assertion or denial not backed up with supporting documentation as required is not adequate and such unsubstantiated assertions cannot be credited and such denials are deemed admissions. *Banner*, 187 B.R. at 946 n. 7 (citing *South Cent. Bank and Trust Co. v. Citicorp Credit Servs., Inc.*, 863 F.Supp. 635, 643 n. 10 (N.D.Ill.1994)); *Edward E. Gillen Co. v. City of Lake Forest*, 3 F.3d 192, 196–97 (7th Cir.1993). Likewise, boilerplate responses, such as denials on the basis of lack of knowledge, are inadequate and insufficient under Rule 402.N. *Banner*, 187 B.R. at 946 n. 7 (citing *South Cent. Bank and Trust Co. v. Citi-*

With each motion for summary judgment filed pursuant to Fed.R.Civ.P. 56 (Fed.R.Bankr.P.4056), the moving party shall serve and file—
(1) any affidavits and other materials referred to in Fed.R.Civ.P. 56(e);
(2) a supporting memorandum of law; and
(3) a statement of material facts as to which the moving party contends there is no genuine issue and that entitles the moving party to judgment as a matter of law that includes;
(a) a description of the parties; and
(b) all facts supporting venue and jurisdiction in this Court.
The statement of facts referred to in (3) shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph. Failure to submit such a statement constitutes grounds for denial of the motion.
If additional material facts are submitted by the opposing party pursuant to section N of this rule, the moving party may submit a concise reply in the form prescribed in section N for a response. All material facts set forth in the statement filed pursuant to section N(3)(b) will be deemed admitted unless controverted by the statement of the moving party.

Local Bankr.R. 402.M.

5. Rule 402.N provides:

Motions for Summary Judgment; Opposing Party
Each party opposing a motion under Fed.R.Civ.P. 56 (Fed.R.Bankr.P.7056) shall serve and file the following:
(1) any opposing affidavits and other materials referred to in Fed.R.Civ.P. 56(e);
(2) a supporting memorandum of law; and
(3) a concise response to the movant's statement of facts that shall contain:
(a) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon; and
(b) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon. All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.
Local Bankr.R. 402.N

*corp Credit Servs., Inc.*, 863 F.Supp. 635, 643 n. 10 (N.D.Ill.1994)).

## B. Undisputed Facts

The following uncontroverted facts were contained in the adequately supported statements of material facts:

1. In 1981, Chang incorporated Joy Metal, Inc. In 1992, Joy Metal Inc. changed its name to Joy Recovery Technology Corporation. Changs' 402.M at ¶ 1.

2. Initially, Chang was Joy's only shareholder. Nick Young ("Young") subsequently became a 50% shareholder of Joy. Chang and Young shared responsibility for operating Joy's business. Changs' 402.M at ¶ 2; Trustee's 402.N(3)(b) at ¶ 92.

3. In addition to being an employee, director and president of one of Joy's divisions, Chang was Chairman of the Board of Directors. Trustee's 402.N(3)(b) at ¶ 96.

4. During 1995, Chang and Young had differences of opinion regarding Joy's governance. Changs' 402.M at ¶ 3.

5. In August 1995, Chang became ill. Changs' 402.N at ¶ 4.

6. On August 16, 1995, Chang was taken to Lutheran General Hospital where he was diagnosed with anoxia/carbon monoxide poisoning. As a result, he experienced difficulty in short-term memory and speech and language ability, lethargy and endurance problems, slower ambulation, fluctuating mental status and changes in personality. Changs' 402.N at ¶ 5.

7. Between July 1995 and the end of 1995, while Chang was sick and recuperating from his illness, he did not participate in Joy's day-to-day decision making. Changs' 402.M at ¶ 6.

8. Because of Chang's illness, Young did not believe that he was physically capable of executing Joy's strategic plan. Changs' 402.M at ¶ 9.

9. Young agreed to prepare weekly memoranda for, and to submit operating reports to Chang regarding Joy's day-to-day activities. Changs' 402.M at ¶ 20.

10. In June of 1995, the Changs retained Michael Shelist ("Shelist") concerning Changs' investment in Joy stock. Trustee's 402.N(3)(b) at ¶ 97.

11. On August 3, 1995, Young retained Edward Salomon ("Salomon") concerning the Changs' stock. Trustee's 402.N(3)(b) at ¶ 105.

12. On August 18, 1995, senior management of Pioneer Bank (the "Bank") prepared an internal document proposing that it loan money to Joy ("August Loan Recap.") Trustee's 402.N(3)(b) at ¶ 102. Three loans were proposed, including one totaling $2.1 million to be used for the purchase of the Chang stock. Trustee's 402.N(3)(b) at ¶ 103.

13. In late September, Young sent Chang a letter of intent and a handwritten memo offering to personally purchase Chang's 50% interest in Joy for $2,600,000. The letter of intent did not contain a financing contingency. Changs' 402.M at ¶¶ 10, 11. Trustee's 402.N(3)(b) at ¶¶ 116, 117.

14. The September memorandum from Young indicated that he had secured a potential party to invest by August 24, 1995. Trustee's 402.N(3)(b) at ¶ 118.

15. The purported investor never committed to purchase Joy's stock. Trustee's 402.N(3)(b) at ¶ 124 [6].

---

**6.** The Changs deny the facts shown in ¶ 15 based on their lack of personal knowledge about conduct or state of mind of the investor. That denial does not reference any sup-

16. The purported investor did not make an investment in Joy. Trustee's 402.N(3)(b) at ¶ 125 [7].

17. To raise the money for the purchase, Young decided that Joy should borrow $2,100,000 ("the Loan") from the Bank. Changs' 402.M at ¶ 44.

18. On September 20, 1995, senior management at the Bank revised the August Loan Recap and proposed that the Bank increase its proposed commitment and agree to make four (4) loans to Joy totaling $4.1 million (the "September Loan Recap.") Trustee's 402.N(3)(b) at ¶ 113 [8].

19. On September 29, 1995 Joy applied for an account at the Bank. Trustee's 402.N(3)(b) at ¶ 119 [9].

20. On or about October 2, 1995, the Bank sent Joy four commitment letters regarding the four loans. Those commitments totaled $4.1 million. Trustee's 402.N(3)(b) at ¶¶ 126, 127 [10].

21. Shortly thereafter, Joy changed its banking and lending relationship from LaSalle Bank to Pioneer Bank & Trust Company. Trustee's 402.N(3)(b) at ¶ 128 [11].

22. On October 13, 1995, Joy entered into a secured credit agreement with the Bank. Trustee's 402.-N(3)(b) at ¶ 129.

23. The Bank made three of the four loans set forth in the September loan recap. The $2.1 million acquisition loan was not made at that time. Trustee's 402.N(3)(b) at ¶¶ 130,131 [12].

24. The Loan Recap from the Bank states that the $2.1 million buyout price was "relatively low ... given [Joy's] current projected growth patterns." Changs' 402.M at ¶ 45.

25. Joy provided the Bank with a copy of Joy's business Plan. Changs' 402.M at ¶ 46.

26. Chang had nothing to do with the financial structuring or negotiating of the Loan. Changs' 402.M at ¶¶ 50–56.

27. The Bank required Young to personally guarantee repayment of the Loan. Changs' 402.M at ¶ 57.

28. Young provided the Bank with his personal financial information. Changs' 402.M at ¶ 58. According to his personal financial statement, Young had a personal net worth of $1,171,000. Changs' 402.M at ¶ 60.

porting documents. This response is not proper or sufficient under Local Rule 402 and therefore the statement is deemed admitted.

7. The Changs deny the facts shown in ¶ 16 because they "lack personal knowledge by Trustee about the conduct or state of mind of Young's purported investor." This denial does not reference any supporting documents. The Trustee's statement supporting this fact is deemed admitted.

8. The Changs deny the facts shown in ¶ 18 because they have "no independent knowledge of the actions or state of mind" of the Bank. No documents are referenced in support of the denial. The Trustee's statement of those facts is deemed admitted.

9. The Changs deny the facts shown in ¶ 19 because they have "no independent knowledge" of the exhibit that Trustee bases his statement on. The response does not refer-

ence any documents in support. The Trustee's statement of those facts is deemed admitted.

10. The Changs deny the facts stated in ¶ 20 based on lack of personal knowledge. The denial does not reference any supporting documents. The Trustee's statement of those facts is deemed admitted.

11. The Changs response to Trustee's facts reported in ¶ 21 does not reference any supporting documentation. This is not an appropriate response under Local Rule 402. The Trustee's statement of those facts is therefore deemed admitted as stated.

12. The Changs deny the facts stated in ¶ 23 because of lack of personal knowledge. No reference is made to supporting documents. The Trustee's statement of those facts therefore is deemed admitted.

29. Joy's obligation to repay the Bank was to be secured by a lien on all of Joy's assets and Young's personal guarantee. Trustee's 402.N(3)(b) at § 114.

30. Joy's Board of Director's never met to discuss whether to enter into the Loan with the Bank. Rather, Young, as Joy's 50% shareholder, authorized Joy to enter into the Loan. Changs' 402.M at ¶ 62.

31. In September, 1995, Young spoke to Chang "maybe twice." Changs' 402.M at ¶ 17.

32. Margaret Yen, Chang's sister, and Cathy Chang asked Richard Yen ("Yen,") Margaret Yen's husband, to assist Chang any way he could. Trustee's 402.N(3)(b) at ¶ 104.

33. Yen communicated to Shelist regarding issues and concerns that Mark and Cathy Chang had, including without limitation, the pending sale of the Chang stock. Trustee's 402.N(3)(b) at ¶ 106.

34. On October 13, 1995 Chang agreed to sell the Chang stock for $2.1 million. Trustee's 402.N(3)(b) at ¶ 132.

35. On October 13, 1995, Young forwarded to Chang a draft copy of an agenda for a board of director's meeting scheduled for October 21, 1995 at 9:00 a.m. The agenda was forwarded to Yen and, in turn, to Shelist. The agenda stated that one of the topics to be discussed was the "JoyRT shareholder acquisition." Trustee's 402.N(3)(b) at ¶¶ 133, 134, 135.

36. Shelist notified Young that there were only two validly elected board members, the other three were not duly elected and any action taken by these purported members would be illegal. Trustee's 402.N(3)(b) at ¶¶ 136, 137.

37. Shelist, as agent for Chang, sent a notice of a shareholder meeting to occur one-half hour earlier than the scheduled board of directors meeting. Trustee's 402.N(3)(b) at ¶¶ 138, 139.

38. On October 20, 1995, the parties entered a letter agreement in which, among other things, provided that the Changs would sell their stock for $2.1 million on or before November 24, 1995. If the sale did not close on or before November 24, Young would be obligated to sell his stock to Chang for $1.8 million by December 15, 1995. Trustee's 402.N(3)(b) at ¶¶ 140, 142.

39. Young and Joy also agreed that between and November 24, 1995, "No major changes in the operation of [Joy] will take place without Chang's approval" and that Chang "will not participate on a day to day basis in [Joy's] business." Changs' 402.M at ¶¶ 15, 16; Trustee's 402.N(3)(b) at ¶ 143.

40. The letter agreement also provided that the board of directors would not take any material actions without the approval of Chang. Trustee's 402.N(3)(b) at ¶ 143.

41. The October 21, 1995 shareholder and board of director meetings were canceled. Trustee's 402.N(3)(b) at ¶ 144.

42. On October 27, 1995, Salomon transmitted to Shelist, Young's offer to purchase the Changs' stock in Joy. Changs' 402.M at ¶ 21; Trustee's 402.N(3)(b) at ¶ 145.

43. The October 27, 1995 offer was a Stock Purchase Agreement ("SPA") between Young and the Changs and it was not subject to a financing contingency. Changs' 402.M at ¶ 22.

44. On October 29, 1995, Lee Riegler, a vice president of Joy, advised Chang, through a memo, that Joy was changing banks from LaSalle

to Pioneer Bank. Trustee's 402.-N(3)(b) at ¶ 120 [13].

45. Pei–Pei Shu, an employee of Joy, provided the Changs with information about Joy's operations. Trustee's 402.N(3)(b) at ¶ 123.

46. Young stated that the information about the Bank loans was known throughout Joy. Trustee's 402.-N(3)(b) at ¶ 121 [14].

47. Chang was in direct contact with a number of people at Joy who were also familiar with the terms of the Bank loans [15]. Trustee's 402.-N(3)(b) at ¶ 122.

48. During a conversation with Lee Riegler, Vice President of Joy, in November, Yen became aware that Joy had switched its banking relationship to Pioneer. Trustee's 402.N(3)(b) at ¶ 148.

49. Yen talked to Cathy Chang about the bank switch. Trustee's 402.-N(3)(b) at ¶ 149.

50. On December 8, 1995, Yen advised Shelist that Joy had changed from LaSalle Bank to Pioneer Bank. Trustee's 402.N(3)(b) at ¶ 152.

51. On December 6, 1995, Young advised Shelist that Joy had changed its banking relationship from La-Salle Bank to Pioneer Bank. Trustee's 402.N(3)(b) at ¶ 150.

52. Young recalls advising Shelist that Joy was borrowing the money from the Bank to finance the purchase of the Chang Stock. Trustee's 402.-N(3)(b) at ¶ 151.

53. On December 21, 1995, the Bank made the $2.1 million Loan to Joy. Changs' 402.M at ¶ 61; Trustee's 402.N(3)(b) at ¶ 154 [16].

54. The corresponding modification agreement with the Bank stated that the $2.1 million was to be used solely to finance Joy's acquisition of the Chang Stock [17]. Trustee's 402.-N(3)(b) at ¶¶ 154, 155.

55. On December 21, 1995, the Bank and Joy entered into that certain modification of secured credit agreement (the "Modification Agreement") which provided that the Bank would lend $2.1 million to Joy to finance the acquisition of the Chang stock. Trustee's 402.-N(3)(b) at ¶ 154.

56. The modification agreement specifically stated that the $2.1 million was to be used solely to finance Joy's acquisition of the Chang Stock. Trustee's 402.N(3)(b) at ¶ 155 [18].

---

**13.** The Changs deny the facts stated in ¶ 44 based on lack of independent knowledge of the supporting document. No reference to supporting documentation is made. This is not an adequate response under Local Rule 402. The statement of the Trustee of those facts is deemed admitted.

**14.** The Changs deny facts stated in ¶ 46 because they have no independent knowledge. No reference to supporting documentation is made. This is not an adequate response under Local Rule 402. The statement of the Trustee of those facts is deemed admitted.

**15.** No reference to supporting documents is given by the Changs in their response to facts asserted in ¶ 47. Therefore Trustee's statement of those facts is deemed admitted.

**16.** The Changs reference no documentation in support of their denial of facts asserted in

¶ 53. The Trustee's statement of those facts is deemed admitted.

**17.** The Changs' cited documentation did not support denial of the Trustee's statement of facts shown in ¶ 54. The reason for denial as stated was not properly substantiated. The Trustee's statement of those facts is therefore deemed admitted.

**18.** The Changs denied Trustee's statement of the facts in ¶ 56, (Trustee Ex. F; Chang Ex. 11), and asserted that "[w]hatever the Modification Agreement states, it was Young, not Joy, who acquired the Chang's stock in Joy." This peculiar response caused the Court to examine the documents referenced by the Changs. Neither of the documents referenced provide cause for denial of the statement. The Modification agreement says what the Trustee claimed that it stated. The Trustee's statement of those facts is deemed admit-

57. On December 22, 1995, the Changs and Young entered into and closed the SPA under which Young agreed to purchase all of the Changs' stock in Joy. Changs' 402.M at ¶¶ 23, 26, 31.

58. Like the Letter of Intent, the SPA was not subject to a financing contingency. Changs' 402.M at ¶ 25.

59. Joy was not a signatory to the text of the SPA. Joy was not a party to the SPA. Changs' 402.M at ¶ 27.

60. As part of the SPA, Chang agreed to enter into an agreement with Joy pursuant to which Joy would pay Chang $100,000 in consideration for his agreement not to compete with Joy. Changs' 402.M at ¶ 28; Trustee's 402.N(3)(b) at ¶ 153

61. The SPA also provided that Chang would enter into an agreement with Joy pursuant to which Joy would pay Chang $200,000 for consulting services. Changs' 402.M at ¶ 29; Trustee's 402.N(3)(b) at ¶ 153

62. Under Section 12 of the SPA, if Young failed to purchase the Changs' stock at the agreed upon terms and within the time set forth in the SPA, then Young would be required to sell his stock to Chang under the same terms and conditions as Chang was obligated to Young under the SPA. Changs' 402.M at ¶ 30.

63. At the closing, in consideration for the Changs' stock in Joy, Young delivered a $1,800,000 cashier's check (the "Check") to the Changs. Changs' 402.M at ¶ 32.

64. Young was the payee of the $1.8 million Check. Changs' 402.M at ¶ 35, Trustee's 402.N(3)(b) at ¶ 156.

65. The Bank had delivered two other checks on December 21, 1995, both payable to Chang. One was for $100,000 and the other for $200,000. Trustee's 402.N(3)(b) at ¶ 156.

66. All three checks said "Loan Department Check" on their faces. Trustee's 402.N(3)(b) at ¶ 157.

67. Young was surprised when one of the three checks was made payable to him instead of Chang. Trustee's 402.N(3)(b) at ¶ 158 [19].

68. When Young inquired about having the check reissued in Chang's name; he was advised that doing so would delay the closing scheduled for December 22, 1995. Trustee's 402.N(3)(b) at ¶ 159.

69. Since Young had check-writing authority on behalf of Joy, Young could have negotiated the Check over to Joy and then made the Check payable from Joy to the Changs. Young did not endorse the check to Joy. Changs' 402.M at ¶ 36.

70. At the closing, Chang received an additional $300,000 from Joy for entering into the consulting agreement and agreeing to the restrictive covenants. Changs' 402.M at ¶ 38, Trustee's 402.N(3)(b) at ¶ 163.

71. On December 22, 1995, Chang resigned as director, president and employee of Joy. Changs' 402.M at ¶ 43.

72. The internal financial statements of Joy were prepared under the control and supervision of Lee Riegler ("Riegler.") Changs' 402.M at ¶ 64.

73. Riegler has an accounting degree from Southern Illinois University and a masters degree in finance from Northwestern University. Changs' 402.M at ¶ 66.

ted due to lack of support for the Changs' denial.

**19.** The Changs' denial of facts stated in ¶ 67 was not responsive to Trustee's statement of fact. Denials must be adequately controverted. Local Bankr.R. 402.M. Due to inadequacy of the response the statement of Trustee is deemed admitted.

74. While he was employed at Joy, Riegler had supervisory responsibilities for accounting, insurance and data processing as well as directing the preparation of Joy's financial statements, income statements, balance sheet and cash flow statement. Changs' 402.M at ¶ 67.

75. Inter-office e-mails were exchanged between Bob Galbraith, an accountant at Joy, and Riegler. These e-mails described the accounting considerations that were consistent with the structure of the transaction evidenced by the SPA—that Young held the stock formerly owed by the Changs; that Young received the benefit of the Loan; and to the extent that Joy paid interest on the Loan, the interest paid would be reported as income to Young. Changs' 402.M at ¶ 82 [20]
.

76. The January and February 1996 internal financial statements reported a profit for 1995. Changs' 402.M at ¶¶ 69–71.

77. Neither the January statement nor the February statement showed that Joy had any treasury stock. Changs' 402.M at ¶ 77.

78. The February statement, prepared by Riegler or under his supervision, was accurate. Changs' 402.M at ¶ 72.

79. The January and February 1996 financial statements were submitted to the Bank. Changs' 402.M at ¶ 73.

80. Young regularly reviewed Joy's financial statements and considered it part of his job to review Joy's financial statements. Changs' 402.M at ¶ 74.

81. Young never advised the Bank that the Financial Statements which Joy sent it during the first four months of 1996 were inaccurate. Changs' 402.M at ¶ 75.

82. Subsequent to the January and February internal statements Young learned of the tax consequences of the presentation of the internal financial statements. Changs' 402.M at ¶ 84.

83. Around August 1996 adjustments were made to the internal financial statements to record the sale as a stock redemption rather than a cross-purchase. Changs' 402.M at ¶¶ 85–87.

84. A memo was prepared by one of Joy's attorneys that advised Joy to treat the transaction as a redemption by the corporations. Changs' 402.M at ¶¶ 88, 89.

85. There is no corporate resolution authorizing Joy to redeem or acquire the Changs' stock. Changs' 402.M at ¶ 90.

86. There are no loan documents or promissory notes between Young and Joy. Trustee's 402.N(3)(b) at ¶ 160.

87. Cathy testified that Chang's illness substantially incapacitated him from August of 1995 until April of 1996. Trustee's 402.N(3)(b) at ¶ 165.

88. Chang was still impaired as the result of his carbon monoxide poisoning as late as June 29, 1999. Trustee's 402.N(3)(b) at ¶ 167.

89. On June 18, 1999, Scott Peltz submitted his solvency analysis of Joy Recovery Technology Corporation as of December 22, 1995 [21]. Trustee's 402.N(3)(b) at ¶ 168.

---

**20.** The Trustee did not reference any supporting documentation for his denial of facts asserted by Changs in ¶ 75. Such a denial is not adequate under Local Rule 402. The Changs' statement is of those facts deemed admitted.

**21.** The Changs deny the Trustee's statement of facts set forth in ¶ 89, saying that they lack personal knowledge. No reference to supporting documents is made. This is not a sufficient response under Local Rule 402.

90. Mr. Peltz analyzed Joy financial information and concluded that: (a) the LBO Transaction left Joy with unreasonably small capitalization; (b) Joy intended to incur debts beyond its ability to pay them as they came due; and (c) Joy was rendered insolvent as a result of the LBO Transaction. Trustee's 402.N(3)(b) at ¶ 169.

## C. Disputed Issues

The following were material contested issues revealed by submissions of the parties [22].

1. Whether Young conveyed to Chang, through the offer to purchase, the handwritten memo of intention to purchase and other correspondence, that he had an investor who was certain to invest. Changs' 402.M at ¶¶ 12, 14.

2. Whether Young conveyed to Chang, through the offer to purchase, the handwritten memo of intention to purchase and other correspondence, that no financing was necessary for the stock purchase because of the investor. Changs' 402.M at ¶ 13.

3. Whether Young began a search for a lender to fund the purchase of the Chang stock in July and August 1995. Trustee's 402.N(3)(b) at ¶ 100.

4. Whether Young intended for Joy to purchase the Chang stock or intended to buy the stock himself using funds from Joy. Changs' 402.M at ¶¶ 21, 44.

5. What the extent of Changs' limitation on customer contact was. Changs' 402.M at ¶ 18.

6. If the reason Young agreed to provide weekly memoranda and operating reports to Chang was because Chang was not to be involved in Joy's day to day business during recuperation and while the parties were negotiating Young's purchase of Chang's stock. Changs' 402.M at ¶ 20.

7. Whether Chang played a part in the preparation of Joy's business plan. Changs' 402.M at ¶ 47.

8. Whether Chang participated in numerous board meetings in 1994 and 1995. Trustee's 402.N(3)(b) at ¶ 111.

9. Whether Shelist concluded that the June 1994 resolutions were "illegal and invalid." Trustee's 402.N(3)(b) at ¶ 112.

10. Whether Yen was Chang's agent and his proxy at shareholder meetings. Trustee's 402.N(3)(b) at ¶¶ 108, 109.

11. The extent to which Yen and Cathy Chang talked about Joy's bank switch. Trustee's 402.N(3)(b) at ¶ 149; Changs' 402.M reply at ¶ 149.

12. Whether Shelist and Yen discussed a $2 million bank loan on or about October 30, 1995. Trustee's 402.N(3)(b) at ¶ 147.

13. Whether the bank loans were proposed as proceeds for Joy's purchase of the Chang stock. Trustee's 402.N(3)(b) at ¶¶ 103, 115.

14. Whether it was Young or Reigler who endorsed the $1.8 million check from the Bank over to the Changs. Changs' 402.M at ¶ 36, Trustee's 402.N(3)(b) at ¶ 164.

15. Whether Young purchased the stock from the Changs with a loan from Joy or whether the sale was a LBO. Changs' 402.M at ¶¶ 37, 80; Trustee's 402.N(3)(b) at ¶¶ 116, 161.

16. Whether the Changs sold their interest in Joy for $2.1 million or

The Trustee's statement of those facts is deemed admitted.

**22.** Some issues are determined to be immaterial. Certain statements were contested in order to clarify context and use specific document language where a party paraphrased. Disputed facts not seen as material by the Court are not included in this discussion.

whether the $2.1 million was payment for the stock, the restrictive covenant and the consulting agreement. Trustee's 402.N(3)(b) at ¶ 104, Changs' 402.M reply at ¶ 104.

17. Whether the press release signed by Young indicates that Young purchased the Chang stock or whether it indicates that Joy purchased the Chang stock. Changs' 402.M at ¶¶ 40, 42.

18. Whether Joy was profitable in 1995. Changs' 402.M at ¶¶ 69, 70.

19. Whether the January and February internal financial statements correctly reflected the December 30, 1995 financial position and accordingly whether the sale of stock was accurately reflected on these statements. Changs' 402.M at ¶¶ 70, 71, 76, 78, 79, 80, 83.

20. Whether the external, reviewed financial statements correctly reflected the company's position after the stock sale. Trustee's 402.-N(3)(b) at ¶ 162.

21. Whether Chang provided any consulting services to Joy under the consulting agreement. Trustee's 402.N(3)(b) at ¶ 166.

## II. DISCUSSION

### A. Jurisdiction

Subject matter jurisdiction is provided under 28 U.S.C. § 1334(b)[23]. The following matters are before the Court according to 28 U.S.C. § 157 and Internal Operating Procedure 15(a) of the United States District Court of the Northern District of Illinois. Venue is proper under 28 U.S.C. § 1409. Jurisdiction lies over Counts I & II and III, IV & V as core proceedings under 28 U.S.C. § 157(b)(2)(H) and (O).

### B. Standards for Summary Judgment

Under Rule 56 Fed.R.Civ.P. [made applicable here under Rule 7056 Fed. R.Bankr.P.]:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c).

The moving party has the initial responsibility of setting forth the basis for the motion and identifying the portions of the evidence that it believes show lack of genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The nonmoving party can oppose the motion by providing evidence as allowed in Rule 56, and specifying those facts that show there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Summary judgment will be granted against a party who fails to establish the existence of an element essential to his case, and on which he has the burden of proof at trial. *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2552.

The court's inquiry "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Inferences are to be drawn in favor of the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513 (citing *Adickes*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970)). Applicable substantive law determines

---

**23.** *Dearborn Process Service, Inc. v. Storner (In re Dearborn Process Service, Inc.)*, 149 B.R. 872, 878 (Bankr.N.D.Ill.1993) (jurisdiction exists in an adversary proceeding against the officers of a corporate debtor for alleged breach of state law fiduciary duties to the corporation).

which facts are material. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

Partial summary judgment is available only where it disposes of at least one count of a complaint. *Commonwealth Ins. Co. of N.Y. v. O. Henry Tent & Awning Co.,* 266 F.2d 200, 201 (7th Cir.1959); *Quintana v. Byrd,* 669 F.Supp. 849, 850 (N.D.Ill.1987).

Finally, it should be noted that recent opinions by panels of the Seventh Circuit have made clear that trial judges must remain sensitive to fact issues where they are actually demonstrated to warrant denial of summary judgment. *Opp v. Wheaton,* 231 F.3d 1060 (7th Cir.2000); *Szymanski v. Rite-Way,* 231 F.3d 360 (7th Cir.2000); *Bell v. EPA,* 232 F.3d 546 (7th Cir.2000).

### C. Characterization of the Sale of the Changs' Stock

■ It is necessary throughout this opinion to reference the dispute over characterization of the stock sale. That issue is a very significant issue of fact to be determined, and it influences the outcome of issues over several elements in the five counts pleaded by Trustee. To avoid redundance, analysis of evidence relating to this question is first addressed.

The Changs contend that the sale was not a leveraged buy-out ("LBO"[24]), but rather was a cross-purchase where Joy loaned $2.1 million to Young to personally purchase the stock. This transaction, the Changs argue, left Joy with no change in equity, but a corresponding increase in assets (through a receivable from Young) and liabilities (through a long term debt owed to the bank.) The Trustee contends that the sale was a LBO whereby the company took on debt to fund the purchase by it of the Changs' stock. The result for Joy, the Trustee argues, is that the debt to the Bank and redeemed stock left Joy with liabilities in excess of assets, resulting in insolvency as defined under the Bankruptcy Code[25].

The Changs have offered the SPA, correspondence between the parties, and other correspondence as evidence that the sale of the stock was between the Changs and Young. These documents do not mention the loan from the Bank or other external financing for the purchase. However, no loan document exists to evidence a loan between Young and Joy. Missing are the actual stock certificates and related records showing Young purchased the stock. The minutes of the Board of Directors show no discussion or authorization of such a significant loan to Young, an officer.

In support of his argument that the sale was between the Changs and Joy, the Trustee provided documents relating to the Bank loan which tend to show that the

24. "A leveraged buyout refers to the acquisition of a company ... in which a substantial portion of the purchase price paid for the stock of a target corporation is borrowed and where the loan is secured by the target corporation's assets. Commonly, the acquirer invests little or no equity. Thus, the fundamental feature of leveraged buyouts is that equity is exchanged for debt." 3 Norton Bankr.L. & Prac.2d § 58A:1 (citing *Mellon Bank v. Metro Communications, Inc.,* 945 F.2d 635 (3d Cir. 1991), cert. denied, 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992)).

25. 11 U.S.C. § 101 defines insolvent as: "... financial condition such that the sum of such entity's debts is greater than all of such entity's property, at fair valuation ..."

Insolvency is also defined by the Uniform Fraudulent Transfer Act as adopted by Illinois.

(a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair value valuation.

(b) A debtor who is generally not paying his debts as they become due is presumed to be insolvent.

(d) Assets under this Section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under this Act.

(e) Debts under this Section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.

740 ILCS 160/3 (emphasis added).

loan of $2.1 million to Joy was for purchase of the Chang stock. The Trustee also provides testimony that the Changs were aware of the loan to Joy and that the loan would be used to fund the purchase. However, no filing with the Secretary of State has been presented to show the redemption of stock by the company, and no certificates have been provided to show who the stock was transferred to. There is no documentation showing that the board of directors took action to approve such a transaction.

In further support of their argument, the Changs presented internal financial statements that reflected a loan to Young from Joy and the Bank loan to Joy. The statements were prepared under direction of Riegler, the Bank's Vice President of Administration, and were given by the Changs to the Bank. In support of the proposition that the transaction was an LBO the Trustee provided year-end reviewed financial statements reflecting the newly acquired treasury stock and Bank loan and a letter from Joy's attorney advising that the sale should be characterized as a LBO. Neither side has offered authority by way of accounting standards or business standards to help determine the weight of the documents and to support the appropriate characterization and accounting treatment of the transaction.

A genuine issue exists regarding the characterization of the sale. A determination on that issue must be made by a trier of fact after review of all evidence and testimony of witnesses. The Trustee has provided sufficient evidence to show that material issues exist as to how the sale documents should be characterized. There is a genuine issue whether Young or Joy purchased the stock from the Changs. There is a genuine issue whether Young purchased the stock and whether Joy loaned the money to Young. There is a genuine issue whether Young obtained a

loan from Joy, whether Young intended to pay the money back, and whether the note had any value. There is a genuine issue that, if Young purchased the stock and obtained a loan from Joy, whether the transaction should ultimately be treated as a LBO. And there is a genuine issue as to how the transaction should be recorded on financial statements of Joy.

**D. Counts I & II: Fraudulent Transfers under 11 U.S.C. § 544 and 740 ILCS 160/5(a)(2) and 160/6(a).**

**1. Standing under 11 U.S.C. § 544**

The relevant part of 11 U.S.C. § 544(b)(1) provides the following:

> ... [T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 [26] of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1).

██ In a case under 11 U.S.C. § 544(b)(1) the Trustee has the rights of an unsecured creditor to avoid transactions that can be avoided by such creditor under state law. 11 U.S.C. § 544(b)(1); *Leibowitz v. Parkway Bank and Trust Co. (In re Image Worldwide, Ltd.)*, 139 F.3d 574, 577 (7th Cir.1998). A specific creditor need not be designated if the Trustee provides evidence of more than one creditor with rights. *Leibowitz*, 139 F.3d at 577. "The Trustee can assume the position of any of them." *See In the Matter of Leonard*, 125 F.3d 543, 544 (7th Cir.1997). The transaction can be avoided completely even if the Trustee cannot produce creditors whose liens total more than the value of the property, *In the Matter of Leonard*, 125 F.3d at 544–45, but the Trustee has done so in this case by providing the court with

**26.** Section 502 of the Bankruptcy Code addresses the allowance of claims or interests, objections to claims, disallowance of claims,

estimated claims and reconsideration of claims.

many proofs of creditor claims filed in the related bankruptcy case.

## 2. Fraudulent Transfer under 740 ILCS 160/5(a)(2)

The applicable state law asserted by the Trustee under 11 U.S.C. § 544(b)(1) is 740 ILCS 160, the Uniform Fraudulent Transfer Act ("UFTA.") The Trustee raises 740 ILCS 160/5(a)(2) in his first count. This statute provides:

> 5(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
>> (2) without receiving a reasonably equivalent value [27] in exchange for the transfer or obligation, and the debtor:
>>
>>> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>>
>>> (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5(a)(2).

██ Section 5(a)(2) of the UFTA is known as "fraud in law," [28] and does not require proof of fraudulent intent. *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1078 (7th Cir.

1997). Because of it's nature, the conveyance is deemed constructively fraudulent. *Levit v. R.T. Milord Co. (In re Thunderdome Houston Ltd. Partnership)*, 2000 WL 889846 (Bankr.N.D.Ill.2000). "Because the UFTA parallels Section 548 of the Bankruptcy Code, findings made under the Code are applicable to actions under the UFTA" [29]. *See Levit v. Spatz (In re Spatz)*, 222 B.R. 157, 164 (N.D.Ill.1998); *Leibowitz*, 139 F.3d at 577 (because the Illinois UFTA is a uniform act which derived phrases from 11 U.S.C. § 548(a)(2) we can look to 548 and other court cases interpreting other states' versions of UFTA for assistance.)

### a. Reasonably Equivalent Value

██ The first question is whether the Trustee has established whether a material issue of fact exists as to whether the exchange lacked reasonably equivalent value. The measurement of reasonably equivalent value is a question of fact. *Leibowitz*, 139 F.3d at 576. The test used by the court to determine whether reasonably equivalent value was received is to compare the value transferred to what was received. *Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 387 (7th Cir.1997.) There is no fixed formula for determining reasonable equivalence, but will depend on all the facts of each case, an important element being fair market value. *Barber*, 129 F.3d at 387.

The Changs argue that reasonably equivalent value must be assessed by looking at the transfer as three separate parts,

---

**27.** 740 ILCS sets forth a definition for reasonably equivalent value that is not applicable to this case. It states: "For the purposes of paragraph (2) of subsection (a) of Section 5 and Section 6, a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement." 740 ILCS

160/4(b). For this reason, case law is used as support.

**28.** Section 5 sets forth two theories of fraud, fraud in law and fraud in fact. Fraud in fact is found in 5(a)(1) and requires actual intent. The Trustee does not assert a claim under 5(a)(1) so fraud in fact is not discussed.

**29.** The material distinction between the Code and the UFTA is the statute of limitations. *Levit v. Spatz (In re Spatz)*, 222 B.R. 157, 164 (N.D.Ill.1998).

the $100,000 covenant not to compete, the $200,000 consulting agreement and the $1.8 million stock sale. The Trustee disagrees with this view and has provided a letter from Young's attorney stating that the two agreements have no value and that the transaction is set forth in three pieces as a mechanism for allocating value for tax purposes only.

The strongest support for the Changs' argument is language in the SPA, both the draft attached to the above referenced tax attorney letter, and the final draft. The SPA states that if sale of the Changs' stock did not occur the Changs had the option to purchase Young's stock for $1.8 million. This would lead one to infer that both parties agreed to a value of the stock at $1.8 million. It does not seem likely that Young would pay more for the stock than he would want to receive himself. But this case is one with many conflicting documents.

As noted above as an undisputed fact, Young and Chang agreed in section 12 of the SPA that if the sale by the Changs was not completed by the time set forth, Young must sell his stock to the Changs under the same terms and conditions as the Chang sale. A logical inference in such a case could be that Young would then also have to enter into a covenant not to compete and consulting agreement as these two agreements are set forth in the SPA as terms and conditions of the sale.

Evidence presented by the parties shows that Chang had developed relationships with certain large customers. If true, Joy would encounter difficulties in renewing these valuable contracts without Chang and thus the consulting agreement would be necessary. The Peltz report, submitted by the trustee, indicates that the scrap metals industry was highly competitive in 1995. With the pressure of this competitiveness Joy could not afford to have the Changs, with their long history in the industry and assuredly substantial relationships, compete against them. The same is true for Young however. For the same reasons Joy could not afford to have Young competing against it. These consulting agreements and covenants not to compete would be necessary in any stock sale by a shareholder in a closely held company who has played a large role in the development and management of the company. Regardless of the form of the transaction involved here, the substance was that a stock sale could not occur without these types of protections and such protections are conditions with, for the most part, arbitrary values attached to them for bookkeeping purposes.

It is clear from the three checks given as part of the transaction that the value transferred from Joy totalled $2.1 million. The Trustee argues that the company was insolvent at time of the transaction; therefore the stock, covenant not to compete, and consulting agreement were all worthless and substantially equivalent value was not provided. In support of this point the Trustee cites *Stearns v. United States*, 61 F.Supp. 664 (D.Mass.1945) and *Michel v. Gard*, 181 Ill.App.3d 630, 130 Ill.Dec. 164, 536 N.E.2d 1375 (3rd Dist.1989). Trustee's reading of *Michel* is incorrect. The court in *Michel* drew no conclusion on the relation between insolvency and the value of corporate shares, but rather was merely providing background of the case and stated "in 1985, the corporation became insolvent and the shares worthless". *Michel*, 181 Ill.App.3d at 632, 130 Ill.Dec. 164, 536 N.E.2d at 1377. No conclusion of a legal relation can be drawn from this statement. The opinion in *Stearns* only states "the order of insolvency of May 17, 1937, together with the other circumstances indicated in finding of fact No. 2, established that the taxpayer's preferred shares were worthless." *Stearns*, 61 F.Supp. at 664. We are not given any detailed information in the *Stearns* opinion as to other circumstances, evidence or rationale for finding of fact No. 2. *Stearns*, 61 F.Supp. 664. The conclusion stated by the Trustee can not be directly inferred from the court's opin-

ion in *Stearns,* so the guidance given by that opinion is limited.

It has been held that a stock redemption by an insolvent company cannot supply reasonably equivalent value. *Joshua Slocum Ltd. v. Boyle (In re Joshua Slocum, Ltd.),* 103 B.R. 610, 618 (Bankr.E.D.Pa. 1989) *aff'd* 121 B.R. 442 (E.D.Pa.1989). Joy's financial statements and even the Peltz report tend to show that Joy was not insolvent before the sale. However, the evidence has not shown whether Joy became insolvent as a result of the sale.

Authorities have held that redemptions in general fail to supply reasonably equivalent value. *Corporate Jet Aviation, Inc. v. Vantress (In re Corporate Jet Aviation),* 57 B.R. 195, 198 (Bankr.N.D.Ga.1986) *aff'd* 82 B.R. 619 (N.D.Ga.1987) *aff'd* 838 F.2d 1220 (11th Cir.1988). But as earlier stated, determination of reasonably equivalent value must be based on facts of a particular case. There may be instances where the facts prove that a stock redemption does constitute reasonably equivalent value. *Consove v. Cohen (In re Roco Corp.),* 701 F.2d 978, 982 (1st Cir.1983); *Joshua Slocum,* 103 B.R. at 619. Because the issue as to characterization of the sale remains a genuine issue of material fact, this question need not be further addressed here as it may not apply if ultimately found that Joy received a valid note from Young in exchange for funds.

The Trustee has met his burden to show that one or more material issues exist. The question of reasonable equivalence therefore cannot be determined because it cannot on this record be found what Joy received and therefore cannot be determined the value thereof.

## b. Financial Effect on Company

The second element of § 160/5 is whether the transaction (a) left the company operating with assets that were unreasonably small in relation to the business, or

(b) caused the company to incur debts beyond its ability to pay as due. The Trustee has submitted evidence (the Peltz report) to raise a question on this issue. However, the Peltz report was based on assumption that the transaction was a LBO, and as pointed out there is a material issue that remains regarding the transaction characterization. The financial effect on Joy, as noted earlier, would vary significantly depending on whether the sale is found to be a LBO or a cross-collateralization.

The Peltz report does offer some support for the argument that the debt caused Joy to become unable to meet debt obligations regardless of how the sale is characterized. If the transaction was a cross collateralization, Joy was given a note receivable that was not collectable. There has been no evidence presented that payments were ever made on the note. Joy would have been left with obligations to pay a debt but no offsetting cash flow from the note.

The Trustee has met his burden regarding this element in his opposition to summary judgment. A genuine issue exists whether Joy was left in the financial condition provided in § 160/5. Summary judgment is therefore denied for Count I.

## 3. Fraudulent Transfer under 740 ILCS 160/6(a).

Non-bankruptcy law asserted in Count II is 740 ILCS 160/6(a):

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value[30] in exchange for the transfer or obligation and the debtor was insolvent[31] at that time or the debtor became insolvent as a result of the transfer or obligation.

---

**30.** See footnote 27.

**31.** See footnote 25.

740 ILCS 160/6(a) (the Uniform Fraudulent Transfer Act as adopted in Illinois "UFTA").

One difference between section § 160/6 of the UFTA and § 160/5 is that § 160/6 includes the requirement that a creditor who has the right to assert some claim must have a claim that arose before the alleged fraudulent transaction. 740 ILCS 160/6(a). The Trustee has provided sufficient evidence to show that at least one such creditor exists.

The first element of a claim under § 160/6, equivalent value, is the same element as required in § 160/5 and need not be discussed again. The Trustee has met his burden to show a genuine issue as to equivalent value.

The remaining question for this claim is whether Joy became insolvent as a result of the stock sale. As discussed above, no evidence has been presented to show that Joy was insolvent before or at time of the sale. Therefore, we only need look to whether Joy was made insolvent as a result of the sale.

The Trustee has introduced the Peltz report to show that a genuine issue exists to the effect of the sale on Joy. The Peltz report tended to show that Joy became insolvent as a result of the transaction, but that conclusion was based on the transaction being a LBO. We are again left with the question of characterization that determines how to analyze this element.

The trustee has met his burden by providing sufficient evidence to raise a genuine issue of material fact as to how the transaction should be treated and if treated as an LBO whether the LBO rendered the company insolvent. Summary judgment must therefore be denied on Count II.

### 4. Initial Transferee under 11 U.S.C. § 550(a)

The Changs allege that Young was the initial transferee of the distribution and therefore they are not liable to the estate. The applicable portion of 11 U.S.C. § 550(a) states:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544 ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee or such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

The Code does not address which party has the burden of proof on whether the defendant is an initial or subsequent transferee under § 550(a)[32]. It is well established though that the defendant has the burden of proof with regards to counterclaims and defenses. 29 Am.Jur.2d Evidence § 160 (1994). The question of a defendant's status with regards to applicability of a statute is neither a counter claim nor a defense. The burden of proof on all elements remains with the Trustee in the absence of a provision otherwise. *Kepler v. Olson (In the Matter of Musurlian)*, 97 B.R. 985, 987 (Bankr.W.D.Wis.1989).

"Just as the holder in due course rule requires the transferor of commercial paper to bear the risk and burden of inquiry, increasing the liquidity of paper, so § 550(b) leaves with the initial transferee the burden of inquiry and the risk if the conveyance is fraudulent." *See Bonded Fin. Services, Inc. v. European Am. Bank*, 838 F.2d 890, 892 (7th Cir.

**32.** The Trustee argues that the defendant has the burden on this issue as a part of their burden of proving § 550(b). The Trustee cites *Hooker Atlanta (7) Corp. v. Hocker (In re Hooker Investments, Inc.)*, 155 B.R. 332, 337 (Bankr.S.D.N.Y.1993) and *Kapila v. Funding, Inc. (In re Data Lease Fin. Corp.)*, 176 B.R. 285, 286 (Bankr.S.D.Fla.1994) as authority. Neither of these cases support the Trustee's argument.

1988). A panel of the Seventh Circuit has determined that a party that holds the property "only for the purpose of fulfilling an instruction to make the [property] available to someone else is not a transferee, but an intermediary." *Bonded Fin.*, 838 F.2d at 893. Intermediaries cannot be held responsible for such transfers because to do so would inevitably result in the creation of precautionary processes that would burden the efficiency of transactions. *Bonded Fin.* at 893. A transferee is the party that has dominion over the money or other asset, and has the right to put the money to his own purposes. *Id.*

In order to determine whether the Changs were initial transferees or immediate or mediate transferees it is necessary first to determine the status of Young. This is necessary, as the Changs point out, because Young was the payee on the largest of the checks. Also, because of the conflicting documents that were presented it is difficult to ascertain when Young was acting on his own behalf and when he was acting as an agent of Joy.

If Young acted as an agent of Joy, then the Changs would most likely be initial transferees. If Young was not acting as Joy's agent, but rather acted as the purchaser of stock, he would have been the recipient of funds and most likely would be viewed as the initial transferee. In the latter case the Changs would be immediate or mediate transferees.

The problem that arises is that the status of Young is not determinable on this record as it hinges on characterization of the sale. If the sale of the stock is an LBO with a sale between the Changs and Joy, Young would only have been an agent of Joy in the transaction. A genuine issue of material fact exists as to the status of the Changs under § 550(a). The Trustee has again met his burden to defeat summary judgment.

### 5. Good Faith Transferee under 11 U.S.C. § 550(b)(1)

The Changs have raised § 550(b)(1) [33] as their defense to the two claims under 11 U.S.C. § 544 and the UFTA. The Changs argue that they are subsequent transferees who took for value, in good faith, and without knowledge of the voidability of the transfer.

This section of the Bankruptcy Code only applies to immediate or mediate transferees. 11 U.S.C. § 550(b). As noted above a genuine issue exists as to the status of Young, and resultantly, the Changs. The application of this provision of the Code to the Changs depends on the ultimate characterization of the sale. If the sale should be characterized as an LBO and Young an agent of Joy or if it is determined that the sale should be collapsed so in substance the exchange was between Joy and the Changs, then the Changs would be the initial transferees and § 550(b)(1) would not be available as a defense. As a result, the Court need not look at the elements of § 550(b)(1) at this time.

### E. Count III: Breach of Fiduciary Duty and Count V: Breach of Fiduciary Duty as Chairman of the Board of Directors [34]

In Count III the Trustee asserts that the Changs, as directors, officers and only shareholders of Joy, owed Joy a fiduciary duty to act loyally and in the best interests of the companies. That by causing Joy to incur the note with the Bank, the Changs

---

**33.** Under § 550, "The trustee may not recover under section (a)(2) of this section from—(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided."

**34.** There was some difficulty in deciphering claims of the last three counts in light of the pending motion, the amendment, and the memoranda of law. Those claims may be in process of evolution.

breached their fiduciary duty to act loyally and in the best interest of the companies.[35]

In Count V the Trustee asserts that Chang, as Chairman of the Board owed Joy and its creditors a fiduciary duty of care and loyalty: a duty to supervise and oversee Joy's financial affairs, and duty not to benefit personally from any mismanagement of the company's financial affairs or from any business or transactions involving the company.

Because these counts have common elements they will be analyzed together.

### 1. Standing

 The trustee of the estate is the appropriate party to bring a suit against directors, officers or stockholders of a bankrupt corporation for breach of fiduciary duties or misappropriation of assets. The right to any damages passes to the trustee in bankruptcy. *Koch Refining v. Farmers Union Central Exchange, Inc.,* 56 B.R. 242, 243 (N.D.Ill.1985); *Barber v. Martin (In re Martin),* 162 B.R. 710, 714 (Bankr.C.D.Ill.1993).

### 2. Duty as Shareholders

The Illinois Business Corporation Act of 1983 [36] is silent with regards to the fiduciary duty of the shareholders of a company. American Jurisprudence has the following to say with regards to the shareholders' relationship to a company:

> A stockholder does not stand in any fiduciary relation to the corporation or its directors; rather, the directors and officers of a corporation occupy a fiduciary or quasi-fiduciary or quasi-fiduciary relation to the corporation and its stockholders. Although the majority or controlling stockholders may owe the duty of a fiduciary or agent as to the minority stockholders, it is said that mere ownership of stock does not create a fiduciary relation between the stockholders, nor are stockholders trustees or quasi trustees for each other. It has also been declared that the ordinary relationship between stockholders is not that of partners.
>
> On the other hand, if a shareholder exercises actual control and direction over corporate management, a fiduciary duty will be imposed. Likewise, a shareholder in a close corporation stands in a fiduciary relationship to other shareholders, and as such, must deal fairly, honestly and openly with the corporation and fellow stockholders, and must not be distracted from performance of official duties by personal interests.[37] In measuring the fiduciary duty owed and determining whether such duty has been breached under particular circumstances, the courts have often likened close corporations to partnerships—indeed, a close corporation is also sometimes referred to as an incorporated partnership ... and the standard of duty owed has been stated to be one of utmost good faith and loyalty.

18A Am.Jur.2d Corporations § 732.

 Under Illinois law, shareholders of a close corporation have a duty of loyalty to other shareholders and to the corporation. *Rexford Rand Corp. v. Ancel,* 58 F.3d 1215, 1218 (7th Cir.1995). For this standard to apply the corporation does not necessarily have to be incorporated under the Illinois Close Corporation Act. *Rexford,* at 1217. A close corporation is one with few stockholders, usually held by one family or a limited number of families

---

**35.** Trustee's original complaint alleges breach of fiduciary duty against the defendants as directors, officers and only shareholders of the companies. With the dismissal of Nick Young (officer, director and shareholder) and the addition of Count V (against Chang as director) this opinion will only address those charges that remain.

**36.** 805 ILCS 5.

**37.** The relationship between shareholders will not be addressed, as the Trustee has not raised this issue and has not shown any basis where he has the standing to raise such a claim.

and where stock is not generally bought or sold. *Rexford,* at 1217; *Dearborn Process Service, Inc. v. Storner (In re Dearborn Process Service, Inc.),* 149 B.R. 872, 880 (Bankr.N.D.Ill.1993).

■■■ It is undisputed that Joy was a corporation, the issued stock of which was held only by Young and the Changs, each as 50% shareholders. Accordingly, the principles outlined above dictate that the Changs, as shareholders, had a fiduciary duty to the other shareholders and to Joy.

### 3. Duty as Officer and Director

■■■ The relationships between officers or directors and a corporation is controlled by the law of the state of incorporation. *Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488, 509 (N.D.Ill.1988) (citing *Treco, Inc. v. Land of Lincoln Savings & Loan,* 749 F.2d 374, 377 (7th Cir.1984)); *Dearborn Process Service,* 149 B.R. at 880. Under Illinois law corporate officers and directors are fiduciaries of the corporation and have duties of good faith, loyalty and honesty. *Wieboldt,* 94 B.R. 488 at 509; *Dearborn Process Service,* 149 B.R. at 880. They must not enhance their personal interests at the expense of the corporation's interests. *Dearborn Process Service,* 149 B.R. at 880.

■■■ The Trustee contends that the debt that resulted from the sale of the Changs' stock was detrimental to Joy. Directors have a fundamental duty to protect the corporation from reasonably perceived harm, irrespective of its source. *Wieboldt,* 94 B.R. 488 at 509.

### 4. Duties and Evidence

Actions by shareholders that leave a company insolvent could be disloyal and in bad faith. The Changs contend that there was no harm because the internal financial records show that Joy was not rendered insolvent. The Trustee has provided evidence (the Peltz report and the reviewed financial statements) tending to show that Joy was harmed by being rendered insolvent as a result of the sale. Again, this assertion assumes that the transaction was a LBO. Genuine issues of material fact exist as to the characterization of the transaction and resulting effects, as well as the proper accounting method.

The Peltz report provided by the Trustee also concludes that as a result of the stock sale Joy was overburdened with debt and the debt was a factor that led to financial troubles of Joy. The Changs offered no evidence to show that the debt did not contribute to Joy's financial troubles. Because of the material issues noted, a question remains as to whether and how to view any harm to Joy.

The Changs contend that they were not aware of the Bank loan, but understood that Young had secured an outside investor to purchase the Chang stock. The Trustee has presented evidence to suggest that the Changs' agents knew of the loan and this knowledge may be imputed to the Changs. No evidence has been presented to show conclusively that the Changs, or their agents knew of the Bank loan. The Trustee has, however, provided enough evidence to suggest there were plenty of opportunities to learn of the loan and discussions took place between the Changs and their agents about the change in banks.

Whether or not the Changs had knowledge of the transaction they did have a duty as 50% shareholders, officers and directors to keep themselves aware of Joy's business. Chang's health raises some concern about his ability to do that. It is acknowledged by both parties that Chang's health limited his ability to perform to the extent that he had in the past. There is some question as to degree of his physical incapacity. But the undisputed facts show that Chang visited Joy during his illness, and also kept in touch with Yen and with his attorney. No evidence was presented to show that Chang's illness affected him to the point that he could not carry out his duties. Likewise, no authority has been

presented to warrant modification of responsibilities of a fiduciary because of physical illness, though it would seem that at some point deteriorating health must affect the level of one's fiduciary duty and performance of that duty. The evidence does show that Yen, Chang's brother in law, was involved in various discussions and meetings at Joy, and that Chang gave Yen some powers to act on his behalf. The extent of any agency relationship is disputed, but the Trustee has provided evidence to show on the present record that there were opportunities for Chang to keep abreast of Joy's activities.

For Counts III and V, a stockholder's duty was demonstrated, but genuine issues of material fact exist with regards to questions of whether there was breach of these duties and resulting harm. Genuine issues exist as to whether there was harm to Joy, whether the Changs disregarded the known effects to Joy and breached their fiduciary duties by allowing the harm to occur and whether the Changs breached their fiduciary duties by failing to inquire about the specifics of the transaction and any effect that it may have on Joy. Summary judgment must therefore be denied on Counts III and V.

## F. Count IV: Misappropriation of Corporate Assets as an Officer and Director

The Illinois legislature codified the claim theory in Count IV at 805 ILCS § 5/8.60, as a cause for director conflict of interest. Section 5/8.60 provides that a director or officer who receives personal benefit from a transaction with or by the corporation must show that the transaction was "fair" to the corporation. 805 ILCS § 5/8.60; *Olsen v. Floit*, 219 F.3d 655, 657 (7th Cir. 2000.) In the alternative, if disinterested shareholders or disinterested directors approve the transaction after knowing all material facts, the transaction should not be voided. 805 ILCS § 5/8.60; *Olsen*, 219 F.3d at 657.

It is undisputed in papers presented here that the Joy corporate board did not meet to discuss authorization of the bank loan or authorize any stock purchase, and that Young authorized the loan from the bank as a 50% shareholder in Joy. Young's interest in the transaction, though not monetary, was as great as Chang's. Young stood to gain 100% control of Joy if the transaction was carried out. This was a significant, though indirect, interest. As such, Young cannot qualify as a disinterested shareholder.

Because there was no board approval of the transaction, the party asserting validity (here the Changs), have the burden of proof as to fairness. 805 ILCS 5/8.60. In order to consider summary judgment in favor of the Changs, they must have shown evidence to meet that burden. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2553. However, they did not do so.

Because the Chang's failed to meet their burden under summary judgment standards, their motion is denied as to Count IV.

## CONCLUSION

For the reasons set forth above, the Changs' Motion for Summary Judgment will be entirely denied, and Final Pretrial Order will shortly be entered setting the cause for trial. However, pursuant to Rule 7056 Fed.R.Bankr.P. [Rule 56(d) Fed.R.Civ.P.] "Undisputed Facts" Nos. 1 through and including 90 set forth above will be deemed established for trial since they appear to be without substantial controversy.