**In re JOY RECOVERY TECHNOL-OGY CORPORATION, Debtor.**

**Noel Daley, not individually, but solely as Trustee for the Joy Recovery Technology Corporation Liquidation Trust, Plaintiff,**

v.

**Mark J.F. Chang and Cathy C.H. Chang, Defendants.**

**Bankruptcy No. 97 B 36491.
Adversary No. 98 A 02044.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Nov. 20, 2002.

Christopher J. Horvay, Esq., Gould & Ratner, Chicago, IL, for Plaintiff.

Scott N. Schreiber, Esq. Much, Shellist, Freed, Denenberg, Ament & Rubenstein, P.C., for Defendants.

Stephen Wolfe, Esq., U.S. Trustee.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

In the related Chapter 11 Bankruptcy of Joy Recovery Technology Corporation ("Joy"), its liquidating Plan was confirmed on September 24, 1998. Joy liquidated its assets and established a Liquidating Trust (the "Trust") to pursue the present Adversary, over which the confirmed Plan retained jurisdiction in this Court. Noel H. Daley ("Trustee") was appointed as Trustee of the Trust. In that capacity he filed the present Adversary proceeding seeking to recover moneys borrowed by Joy for use by Nick Young ("Young"), president and 50% shareholder of Joy, to purchase Joy stock from Mark Chang ("Chang"), chairman of the board, director, and alleged joint owner of 50% of the company's shares with his wife, Cathy Chang.

The Trustee charges that Chang looted his former company Joy by selling his 50% stock interest to Young in a leveraged buyout ("LBO") which left the company insolvent, and that he thereby constructively defrauded Joy's creditors. The Adversary Complaint also avers that Chang breached his fiduciary duty to Joy's creditors and misappropriated company assets. Accordingly, the Trustee invoked the "strong-arm" powers of Section 544 and 550 of the Code as well the Illinois Uniform Fraudulent Transfer Act to recover $2.1 million from the Changs.

The Complaint is pleaded in five counts: Counts I and II averred fraudulent transfers under Section 544 of the Code and 740 ILCS §§ 160/5(a)(2) and 160/6(a), respectively; Counts III and V alleged that the Changs' owed a fiduciary duty to Joy's creditors as officers and sole shareholders and that they breached that duty by causing the subject transaction; and Count IV charged misappropriation of corporate assets under 805 ILCS § 5/8.60. The Trustee also objects to Changs' claim against Joy under 11 U.S.C. § 510. The charges against Nick Young were settled, and the case went to trial on the remaining allegations against the Changs. After both sides rested, the parties presented their closing arguments in writing. Following trial, the Findings of Fact and Conclusions of Law set forth below are now made and entered.

The Findings and Conclusions are based on consideration of the evidence at trial and written arguments. In an earlier opinion denying summary judgment, the Court made findings of undisputed facts applicable to trial. *In re Joy Recovery Technology Corp.*, 257 B.R. 253 (Bankr. N.D.Ill.2001), which are incorporated in the Findings set forth below. For reasons stated below, Judgment will be entered for the Changs on Count I, but will separately enter for the Trustee on Count II against Mark and Cathy Chang[1] (collectively "Chang"), and individually against Mark Chang on Counts III, IV, and V. Further, the Changs' claim will be subordinated under § 510 of the Bankruptcy Code.

### JURISDICTION AND VENUE

Jurisdiction lies under 28 U.S.C. §§ 1334(b) and 157(a). The matter is referred here under the standing referral of

---

**1.** Cathy Chang was dismissed from Counts III, IV, and V on oral motion of defense counsel at the close of opening statements.

District Court Internal Operating Procedure 15(a). This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(B) and (B)(2)(H). Venue lies here under 28 U.S.C. §§ 1409(a) and (c).

### FINDINGS OF FACT

1. In 1981, Chang incorporated Joy Metal, Inc. In 1992, Joy Metal Inc. changed its name to Joy Recovery Technology Corporation.

2. Joy's business was the recovery of various metals from industrial telecommunications wiring and computers. Joy's recovery operation benefitted its customers in two ways: it reduced acquisition costs by recycling metals, and it minimized potential environmental disposal problems. Initially, Chang held the bulk of Joy's shares and his wife held forty-nine shares of a Joy subsidiary, but Young eventually became a 50% shareholder of the company with the Changs holding the other shares. Chang and Young shared responsibility for operating Joy's business until mid–1995.

3. In addition to being an employee, director, and president of one of Joy's divisions, Chang was Chairman of the Board of Directors.

4. On June 25, 1994, Chang agreed to increase Joy's Board of Directors from two members (formerly only Chang and Young), to five members. This step effectively eliminated Chang's veto power over corporate proposals that he did not like.

5. During 1995, Chang and Young had heated arguments over Joy's future business strategy. Young wanted to invest in a new technology being developed in China. Chang thought the new venture was too risky and wanted to concentrate on Joy's core business. At a board meeting in April 1995, Chang suggested that Young should buy him out or he would buy Young's shares. Young asked Joy's vice-president, Lee Riegler, to explore how he might purchase Chang's stock. Riegler consulted with the law firm of Holleb & Coff which produced a memorandum outlining several possibilities including an Employee Stock Option Plan ("ESOP"), a cross-purchase, a stock redemption, or a combination of all three.

6. Chang rejected the various proposals and insisted on a stock buyout for $2.6 million. Young thought that price was high, but eventually agreed to resolve the impasse between him and Chang. In June of 1995, Chang retained Michel Shelist ("Shelist") as legal counsel regarding the sale of his stock, and Young retained Edward Salomon ("Salomon") as his counsel for the transaction.

7. After returning from a trip to China, Chang became ill.

8. On August 16, 1995, Chang was taken to Lutheran General Hospital where he was diagnosed with anoxia/carbon monoxide poisoning. As a result of his illness, Chang experienced difficulty for several months in short-term memory, speech problems, lethargy, slower ambulation, fluctuating lucidity, and changes in personality.

9. Chang did not participate in Joy's day-to-day decision making between July 1995 and the end of 1995, while he was recuperating.

10. Because of Chang's illness, Young did not believe that Chang was physically capable of executing Joy's strategic business plan.

11. Young agreed to prepare weekly memoranda and operating reports regarding Joy's day-to-day activities for Chang.

12. On August 18, 1995, senior management of Pioneer Bank (the "Bank" or "Pioneer") prepared an internal document offering new credit terms to Joy ("August Loan Recap."). Joy had previously been

financed by LaSalle Bank, but it accepted Pioneer's offer. Part of the funds received from Pioneer was to be used to pay off loans made by LaSalle. Pioneer offered to Joy three loans in all, including one totaling $2.1 million to be used to fund the purchase by Young of Chang's stock.

13. In late September, Young sent Chang a letter-of-intent and a handwritten memo offering that he would personally purchase the Changs' 50% interest in Joy for $2,600,000. The letter-of-intent did not contain a financing contingency. Young told his counsel, Salomon, who drafted the letter-of-intent, that the deal between him and Chang was to be a "cross-purchase."

14. The September memorandum from Young indicated that he had secured a potential party to invest by August 24, 1995. In fact, Young did not actually have an investor, but, he was negotiating with several potential investors in Taiwan. Young testified that he needed an investor because he could not afford to finance the deal himself.

15. No investor ever committed to purchase Joy's stock.

16. To raise the money for the purchase, Young decided that Joy should borrow $2,100,000 ("the Loan") from Pioneer Bank ("Bank").

17. On September 20, 1995, senior management at the Bank revised the August Loan Recap and proposed that the Bank increase its proposed commitment and agree to make four rather than three loans to Joy, these four loans totaling $4.1 million (the "September Loan Recap.") included one loan for $2.1 million to pay for the purchase of Chang's stock.

18. On September 29, 1995, Joy applied for an account at the Bank. On or about October 2, 1995, the Bank sent Joy four commitment letters regarding the four loans. Those commitments totaled $4.1 million.

19. Shortly thereafter, Joy changed its banking and lending relationship from LaSalle Bank to Pioneer Bank & Trust Company.

20. On October 13, 1995, Joy entered into a secured credit agreement with the Bank.

21. The Bank made three of the four loans set forth in the September loan recap. The $2.1 million loan for stock acquisition was not made at that time. Chang was not involved in negotiations with Pioneer Bank, but the switch from LaSalle Bank and payoff of the LaSalle debt meant that Chang no longer had personal responsibility on loans to Joy which he had earlier guaranteed.

22. Pioneer Bank knew that the $2.1 million credit facility would fund the purchase of Chang's stock. The Loan Recap from the Bank stated that the $2.1 million buyout price for that stock was "relatively low ... given [Joy's] current projected growth patterns."

23. Joy provided the Bank with a copy of Joy's business Plan.

24. The Pioneer Bank required Young to personally guarantee repayment of the Loan.

25. Young provided the Bank with his personal financial information. According to his personal financial statement, Young had a personal net worth of $1,171,000. However, he only had $350,000 in liquid assets. Therefore, the bank made the loans directly to Joy.

26. Joy's obligation to repay the $2.1 million loan for the stock acquisition was backed by Young's personal guarantee.

27. Joy's Board of Director's never met to discuss whether to enter into the loan with the Bank, nor was Joy represented by

its counsel, Robert Earhart, in the transaction. Rather, Young testified that he considered the board to be defunct after its legitimacy was challenged by Chang's lawyer. See ¶¶ 33 and 38 infra. Young also testified that he thought he had the authority, as a 50% shareholder, to allow Joy to enter into the transaction.

28. Due to Chang's illness, Chang's sister Margaret Yen and Cathy Chang asked Margaret's husband Richard Yen ("Yen") to assist Chang in any way he could with regard to Joy and the Chang stock.

29. Yen communicated to Shelist regarding issues and concerns of Mark and Cathy Chang as to Joy and the possible sale of Chang's stock.

30. On October 13, 1995, Chang reduced his demand from $2.6 million to $2.1 million. Chang agreed to reduce his asking price because he knew that Joy's contract with Nynex, which represented 40% of the company's sales, was in jeopardy of not being renewed. Another reason for the reduction was the fact that Joy was embroiled in litigation with a company called Fubear which had the potential of jeopardizing Joy's contract with USWEST.

31. On October 13, 1995, Young sent Chang a draft copy of an agenda for a board of director's meeting scheduled for October 21, 1995, at 9:00 a.m. The agenda was forwarded to Yen and, in turn, to Shelist. The agenda stated that one of the topics to be discussed was the "JoyRT shareholder acquisition."

32. Shelist warned Young of his view that there were only two members validly elected to the Joy board, that the other three were not duly elected and that any action taken by these purported members would be illegal.

33. Shelist, as agent for Chang, sent a notice of a shareholder meeting to occur one-half hour before the scheduled board of directors meeting.

34. On October 20, 1995, the parties entered into a letter-of-agreement which provided that Chang would sell his stock for $2.1 million on or before November 24, 1995. Under that agreement, if the stock sale did not close on or before November 24, Young would be obligated to sell his stock to Chang for $1.8 million by December 15, 1995. The agreement was signed on behalf of Joy even though it was not then a party to the Young–Chang transaction.

35. Young and Joy also agreed to maintain the status quo pending the closing date of November 24, 1995: "No major changes in the operation [of Joy] will take place without Chang's approval," and also Chang "will not participate on a day to day basis in [Joy's] business."

36. The agreement also provided that the board of directors would not take any material actions without Chang's approval.

37. The October 21, 1995, shareholder and board of director meetings were canceled because the board was unsure what to do after Shelist challenged its legitimacy. Eventually, the other three board members resigned leaving only Chang and Young on the board.

38. On October 27, 1995, Salomon transmitted Young's offer to purchase Chang's stock to Shelist.

39. The October 27, 1995, offer was for a Stock Purchase Agreement ("SPA") between Young and Chang and it was not subject to a financing contingency.

40. On October 29, 1995, Riegler advised Chang, through a memo, that Joy was changing banks from LaSalle to Pioneer Bank.

41. Pei–Pei Shu, an employee of Joy, provided Chang with information about Joy's operations during his illness.

42. Young testified that the information about the Bank loans was known throughout Joy.

43. Chang was in direct contact with a number of people at Joy who were also familiar with terms of the Pioneer Bank loans.

44. During a conversation in November of 1995 with Riegler (Vice President of Joy) (then acting as Chang's representative to terms of stock sale), Yen became aware that Joy had switched its banking relationship to Pioneer.

45. On December 8, 1995, Yen advised Shelist that Joy had changed from LaSalle Bank to Pioneer Bank.

46. On December 6, 1995, Young advised Shelist that Joy had changed its banking relationship from LaSalle Bank to Pioneer Bank.

47. Young informed Shelist that Joy was borrowing the money from Pioneer Bank to finance the purchase of the Chang Stock.

48. On December 21, 1995, the Pioneer Bank and Joy entered into a modification of the secured credit agreement (the "Modification Agreement") which provided that the Bank would lend Joy $2.1 million to finance the acquisition of Chang's stock.

49. The modification agreement specifically stated that the $2.1 million was to be used solely to finance Joy's acquisition of Chang's Stock.

50. On December 22, 1995, Chang and Young executed the Stock Purchase Agreement under which Young agreed to purchase all of the Chang stock in Joy.

51. Like the Letter–of–Intent, the SPA was not subject to a financing contingency.

52. Joy was not a signatory to the text of the SPA, nor was it a party to it.

53. As part of the SPA, Joy agreed to pay Chang $100,000 for a non-compete agreement.

54. The SPA also provided that Joy would pay Chang $200,000 for consulting services.

55. Under Section 12 of the SPA, if Young failed to purchase Chang's stock at the agreed upon terms and within the time set forth in the SPA, then Young would be required to sell his stock to Chang under the same terms and conditions as Chang was obligated to Young under the SPA.

56. At the closing, in consideration for Chang's stock in Joy, Young delivered a $1,800,000 cashier's check.

57. Young was the payee of the $1.8 million Check.

58. The Bank delivered two other checks on December 21, 1995, both payable to Chang. One was for $100,000 and the other for $200,000.

59. All three checks were labeled "Loan Department Check."

60. Young claims to have been surprised when the $1.8 million check was made payable to him instead of Chang, but Salomon had instructed the Bank to issue that check to Young so that if there were any problems at the closing it would be easier for Young to redeposit the check.

61. Young was told that the closing would be delayed if the Bank had to reissue the $1.8 million check to Chang, and that is why (he claims) he endorsed that check to Mark Chang as part of the transaction to acquire the Chang stock.

62. On December 22, 1995, Chang resigned as director, president and employee of Joy, and Young received assignment to himself of the shares formerly held by Chang. After the closing, Joy issued a

Press Release announcing that Young had "acquired 100% of the stock owned by his partner, Mark Chang."

63. The internal financial statements of Joy were prepared under the control and supervision of Lee Riegler, Joy's chief financial officer.

64. Riegler has an accounting degree from Southern Illinois University and a graduate degree in finance from Northwestern University.

65. While he was employed at Joy, Riegler had supervisory responsibilities for accounting, insurance, and data processing as well as directing the preparation of Joy's financial statements, income statements, balance sheet, and cash flow statement.

66. Subsequent to closing of the stock transaction, Joy's outside accountant David Lee instructed Riegler that the Young–Chang transaction was a cross-purchase and that Joy should book a $1.8 Million receivable from Young. Riegler then instructed Bob Galbraith, an accountant at Joy, to book the loan to Young. Consequently, starting in January 1996, Joy's financial statements showed a $1.8 million receivable from Young. However, there was no promissory note or other documentation to substantiate any loan to Young.

67. The January and February 1996 internal financial statements reported a profit for 1995.

68. Neither the January statement nor the February statement showed that Joy had any treasury stock.

69. Accuracy of the February statement for Joy prepared by Riegler or under his supervision was not contradicted by evidence.

70. The January and February 1996 financial statement for Joy were submitted to the Pioneer Bank.

71. Young regularly reviewed Joy's financial statements and considered it part of his job to review Joy's financial statements.

72. Young never advised the Pioneer Bank that the Financial Statements which Joy sent to the Bank during the first four months of 1996 were inaccurate. Nor did he challenge Joy's internal balance sheets and summaries for the period December 1999 through May 1996, which all showed $1.8 million loan debt due to Joy from Young.

73. Subsequent to issuance of the January and February internal financial statements for Joy, Young learned of the adverse tax consequences to him of booking the Young–Chang transaction as a loan to him.

74. Starting in August 1996, the internal financial statements of Joy were changed to show the Young–Chang transaction as a stock redemption rather than a cross-purchase.

75. Young was advised to re-characterize the transaction by Salomon's partner, Marshall Brown, in order to avoid paying income tax on any payments made by Joy on the bank loan obtained to fund Young's purchase of the Chang stock.

76. There was no corporate resolution authorizing Joy to redeem or acquire Chang's stock.

77. Fact statements set forth below in the Conclusions of Law will stand as additional Findings of Fact.

### CONCLUSIONS OF LAW

A. *The Expert Issues*

The parties offered expert witnesses, and following preliminary *Daubert* hearings each was allowed to testify. Chang moved *in limine* to bar expert witnesses offered by Plaintiff, and the Trustee

sought to bar testimony by Chang's experts. Those motions and objections were all denied at trial for reasons more fully set forth below.

### Standards for Expert Testimony

The touchstone for qualifying expert witnesses in federal court is reliability and relevance. *Comer v. American Electric Power,* 63 F.Supp.2d 927, 932–33 (N.D.Ind.1999) (collecting cases from this circuit); Fed.R.Evid. 702. To satisfy the first prong of the test requires the court to assure that the expert's testimony is based on scientific knowledge, and not merely conjecture. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Thus, the court must make "a preliminary assessment of whether the testimony is scientifically valid." *Id.* at 592–93. Daubert set out a nonexclusive list of factors to guide this analysis: (1) whether the theory can be and has been verified through testing; (2) whether the theory has been subjected to peer review or publication; (3) the known or potential rate of error and the existence of standards controlling the technique's operation; (4) the extent to which the methodology employed by the expert is generally accepted by experts in the field. *Id.* at 593–94, 113 S.Ct. 2786. Courts are not required to consider any one or all of these factors before allowing an expert to testify. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Instead, broad discretion lies with the court to decide whether to use the *Daubert* factors in a given case. *Id.*

The thrust of the inquiry is not to determine the correctness of the proffered testimony; such issues go to the weight accorded to the testimony, not its admissibility. *Cummins v. Lyle Indus.,* 93 F.3d 362, 368 (7th Cir.1996). Rather, the goal is to preclude testimony that, owing to

its unreliability, fails to help the factfinder to understand the evidence. Such evidence fails the relevancy requirement of *Daubert.* To satisfy the test for relevance, the expert's testimony must fit the issue that he or she is testifying about and it must aid in the resolution of a fact in issue. *United States v. Hall,* 165 F.3d 1095, 1101–02 (7th Cir.1999). Even reliable testimony may be precluded if it does not meet the standard for relevance. *Id.* at 1103 Fn. 4; Fed.R.Evid. 702.

### Chang's First In Limine Motion

Chang's first *in limine* motion sought to bar the testimony of Scott Peltz ("Peltz"), the trustee's key solvency expert. Peltz is a CPA with over twenty-years of experience. He has testified as an expert witness in more than a half-dozen bankruptcy cases and has published numerous articles relating to bankruptcy and accounting. (See Trustee's Exhibit 59 tab 14). Chang asserted three grounds in support of his *in limine* motion: (1) Peltz's testimony constitutes improper legal conclusions; (2) Peltz lacks credibility because he is a de facto contingent witness; and (3) Peltz's testimony is "not consistent" with business valuation techniques employed by professionals in his field.

#### 1. *Peltz's testimony was not an improper legal conclusion*

The scope of expert testimony is governed by Evidence Rule 702 which limits expert testimony to that which will assist the factfinder in understanding the evidence or in resolving a fact in issue. But the assistance offered by an expert does not included telling the factfinder how it should rule. Hence, experts are not allowed to give legal conclusions. *Hygh v. Jacobs,* 961 F.2d 359, 363 (2nd Cir.1992) (quoting advisory committee's note for rule 704). However, expert witnesses may ren-

der opinions on an ultimate fact issue in a case. Fed.R.Evid. 704(a). It is important to note that Rule 704(a) allows expert witnesses to reach "an" ultimate issue at trial—not the ultimate issue at trial. See 29 Wright & Gold,Fed. Prac. & Proc. Evid. § 6284. For example, an expert witness may opine on whether a person had the ability to appreciate the extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution, but may not testify whether that person had the capacity to make a will. See Advisory Committee's Note Fed. R.Evid. 704(a). The former is derived from application of the expert's specialized knowledge to the facts of the case to aid the factfinder's inquiry into a fact in issue; the latter issue requires understanding and application of the law of wills, and therefore invades the judge's responsibility. *West Coast Video Enterprises, Inc. v. Ponce de Leon,* No. 90 C 1236, 1991 WL 49566 at *9 (N.D.Ill.) (court does not need expert to tell it the law). Left unchecked, the expert could supplant the judge's role of determining the law. *Hygh,* 961 F.2d at 364. Such testimony is objectionable because it invades the province of the trial judge. *Panter v. Marshall Field & Co.,* 646 F.2d 271, 293 n. 6 (7th Cir.1981).

Here, Chang argues that Peltz proffered impermissible legal conclusions because he expressly referred to the Illinois Fraudulent Transfer Act ("IUFTA") in his written report and lifted language directly from the statute. Chang relies on three cases for support, but two of those cases merely recite the principles outlined above. The third case, *Burkhart v. Washington Metropolitan Area Transit Authority,* 112 F.3d 1207 (D.C.Cir.1997), is distinguishable on two grounds.

First, unlike the present case, *Burkhart* involved a jury trial. The jury found for the plaintiff, a deaf passenger, against a bus company after an altercation with a bus driver. *Id.* The need to protect jurors from adopting legal conclusions of an expert witness does not exist when the trial judge is factfinder. The court will not rely on the expert to instruct it on the law. Secondly, unlike here, the expert in Burkhardt was erroneously allowed to instruct the jury on requirements of the statute at issue in the case. *Id.* at 1213 (trial court erred by allowing the plaintiff's expert witness to erroneously interpret the Americans with Disabilities Act). The expert's testimony also included terms of art lifted directly from the statute. *Id.* at 1213–14. Although, Peltz organized the disputed section of his report to correspond to subsections of the IUFTA, the actual analysis was consistent with principles of accountancy. (See Exhibit 59 p. 19–22). Peltz gave his opinion on whether Joy was rendered insolvent as a result of the Young–Chang transaction, but his conclusion was based on applying accounting rules to Joy's financial reports, not on a legal determination of what constitutes insolvency. Experts are required to fit their analysis to the issues in the case. Otherwise, the testimony is irrelevant. *United States v. Hall,* 165 F.3d 1095, 1101–02 (7th Cir. 1999). The mere fact that Peltz's report referred to relevant portions of the IUFTA did not render it an impermissible legal conclusion. *A.E. ex rel. Evans v. Independent School Distr. No. 25,* 936 F.2d 472, 476 (10th Cir.1991) (expert may refer to the law in expressing his or her opinion).

It is true that Peltz also summarized his opinion as to Joy's solvency by utilizing terms that were lifted from the statute. For example with regard to his tests under IUFTA 5(a)(2) he recited the relevant statute and then concluded: "Based on the analyses presented herein, I concluded that the LBO Transaction [sic] left Joy

with unreasonably small assets in relation to its business and the liabilities of that business; and Joy intended to incur debts beyond their ability to pay them as they came due (see above)." (See Exhibit 59 p. 22). Peltz would not be allowed to make such pronouncements to a jury. However, the court is able to view such statements as mere surplusage, and to focus instead on those portions of Peltz's analyses that assisted the court's understanding of the financial data. Therefore, Chang's first objection was denied.

### 2. Chang's Objection to Peltz a Contingent Fee Witness

■ Chang also asserted that Peltz should be precluded from testifying because he is a de facto contingent witness due to the fact that the Trustee ran out of money to pay his fees and currently owes him an undisclosed amount of money. Peltz admits that he will not be paid unless the Trustee prevails. Chang relies on authority from the Fourth Circuit which has held that contingent witnesses are forbidden under common law. See *Accrued Financial Services, Inc. v. Prime Retail, Inc.*, 298 F.3d 291, 300–01 (4th Cir.2002); *Farmer v. Ramsay*, 159 F.Supp.2d 873, 883 (D.Md.2001). The principle underlying these opinions is that expert witnesses should not be encouraged to falsify or exaggerate their testimony by having their compensation tied to the outcome of the case. Most states have codified this rule by barring attorneys from using contingent experts in their rules of Professional Responsibility.

■ However, the better view, which is the one adopted in this Circuit, distinguishes between rules of ethics and the rules of evidence. "[T]he Code [of Professional Responsibility] does not delineate rules of evidence but only sets forth strictures on attorney conduct." *Universal*

*Athletic Sales Co. v. American Gym, Recreational & Athletic Equipment Corp.*, 546 F.2d 530, 539 (3rd Cir.1976); *Tagatz v. Marquette University*, 861 F.2d 1040, 1042 (7th Cir.1988) (rule against contingent fee expert witnesses is a rule of professional conduct rather than of admissibility of evidence). There is nothing in the rules of evidence that bars testimony from contingent fee experts. However, under Fed. R.Evid. 601 the factfinder may discount the credibility of such witnesses. *See United States v. Valona*, 834 F.2d 1334, 1343 (7th Cir.1987) (rejecting per se exclusion of contingent fee witness and saying that better approach is to allow factfinder to consider fee arrangement as a credibility factor).

To preclude Peltz from giving evidence at trial, Chang had to show that Peltz's testimony was either irrelevant or unreliable. Neither was shown. The notion that Peltz's testimony is inherently unreliable confuses an ethical rule with evidentiary rule, and is contrary to the authority in this Circuit. Chang has not offered any authority for the proposition that contingent fee experts are incompetent to testify in federal court or that evidence obtained from such witnesses is inadmissible. Merely showing that Peltz may have an incentive to exaggerate his testimony is insufficient to bar that testimony. Moreover, the court is unwilling to sanction Joy's creditors by barring evidence from their key witness because the Plaintiff ran out of funds to pay him. However, the court is mindful of the fact that Peltz had an incentive to shade his testimony in favor of the Trustee, and this was a consideration in the assessment of his credibility, though not dispositive.

### 3. Chang's Objection that Peltz's Evidence is Unreliable

■ Chang's counsel objected that Peltz committed numerous computational

errors in his analyses. He contends that asserted errors showed that Peltz did not follow general standards of others in his field. Those alleged errors will be dealt with below, but for purposes of the *Daubert* analysis, the issue is whether any errors are so gross as to render the testimony inadmissible. The main requirement for expert testimony in federal court is that it must assist the factfinder to understand the evidence or to resolve a fact in issue. *Daubert*, 509 U.S. at 588, 113 S.Ct. 2786 (quoting Fed.R.Evid. 702). Thus, the focus of a *Daubert* hearing is not to determine if proffered testimony is entirely accurate; rather, the inquiry is into whether the evidence was derived from methods that are generally employed by experts in that field. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). "Judges must look behind an expert's ultimate conclusion and analyze the adequacy of its foundation." *Mid–State Fertilizer v. Exchange National Bank*, 877 F.2d 1333, 1339 (7th Cir.1989). If the expert employed the same methodology as those in his or her field then the evidence is admissible, unless the testimony is so totally at odds with the underlying data as to render it mere subjective speculation, in which case it would be irrelevant. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir.2000) (*Daubert* test is concerned with methodology, not conclusions); *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318 (7th Cir.1996) (without proper foundation opinion is unscientific speculation); *Comer v. American Electric Power*, 63 F.Supp.2d 927, 933 (N.D.Ind.1999) (at bottom the reliability requirement is intended to rule out subjective belief) (citation omitted).

■ This flexible standard of admissibility is intended to foster competing evidence from experts on both sides of a case. *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786.

Even an expert's flawed conclusion is capable of helping the factfinder to understand the evidence. Thus, the court does not have to accept the validity of the conclusions reached by Peltz for the evidence offered by Peltz to be admissible.

■ Although Chang made an effort to show errors in Peltz's report, the alleged errors were conclusions based on assumptions made by Peltz which were in the purview of an expert accountant. For example, Chang argued that Peltz did not add $167,000 in nonrecurring expenses back into his computation of the income stream. Peltz stated that he stood by his decision because he believed the hold-back was necessary to establish a reserve against similar costs in the future. This is but one of many assumptions made by experts on both sides. Accounting is not an exact science. Accountants are therefore required to make judgments about how to communicate financial information. A *Daubert* hearing is not the time to fully test the validity of those assumptions.

After reviewing the evidence offered by Peltz, it was concluded that Peltz employed the methodology used by accountants engaged in business valuation, and that he observed the same level of rigor as others engaged in such analysis. Notwithstanding the alleged errors argued in Chang's motion, the assumptions made by Peltz were certainly not so inappropriate as to render his testimony speculative.

Further, Chang's contention that Peltz failed to use basic accounting principles because he did not apply the classic accounting "formula" (where value of assets = equity + liabilities) is without merit. Chang's reliance on *Frymire–Brinati v. K.P.M.G. Peat Marwick*, 2 F.3d 183 (7th Cir.1993), is misplaced because that case is inapposite. In *Frymire–Brinati*, the panel opinion reversed the trial court because the judge failed to conduct a "preliminary

assessment" to assure that the expert's testimony was based on the proper methodology. *Id.* at 186. Hence, the testimony was deemed unreliable. *Id.* Here, the court conducted a full *Daubert* hearing to assure that the evidence offered by Peltz was based on a proper foundation of methodology. Moreover, Peltz explained that the reason he did not use the classic accounting formula in his work was because he was not constructing a balance sheet. Peltz's analysis utilized data taken from Joy's balance sheet, which was also relied upon by Chang's expert and can be viewed as the functional equivalent of the "formula."

Finally, Chang claims that Peltz was seeking an answer to the wrong question because he did not use fair market value for his balance sheet test for insolvency. However, this argument presupposes that which had to be adduced at trial, namely that the Joy business was not on its deathbed after the Young–Chang transaction. The decision to value assets as a putative buyer or whether to use a liquidation sale value is based on assessment of company's viability during the relevant period. Chang could not prevent Peltz from testifying as to what valuation technique he chose and the reasons underlying that choice. Such decisions are routinely made by professional accountants.

### Chang's Second Motion In Limine as to Terpstra

Chang also sought to bar testimony of Martin W. Terpstra ("Terpstra") on grounds that his testimony was speculative and therefore irrelevant. Terpstra is a Certified Public Accountant with over 20 years of experience. He is also a Certified Fraud Examiner who has been engaged as a forensic accountant, including multiple assignments to determine the proper accounting treatment of business transactions. The Trustee employed Terpstra to evaluate the Young–Chang transaction, and he concluded that the "most appropriate" treatment of the transaction is as a stock redemption. The significance of how the transaction is booked is that the Trustee's case is contingent upon showing a transfer of assets from Joy to Chang. *See In re Joy Recovery Technology Corp.*, 257 B.R. 253, 264 (Bankr.N.D.Ill.2001) (Schmetterer, J) (denying summary judgment, but specifying undisputed facts in this case for trial).

Chang contends that Terpstra's own report shows that he had no basis for treating the transaction as a redemption, relying on the following statement in that report:

> Based on a review of the transaction documents, there are no facts to support the utilization of any one particular accounting treatment. As such, our analysis and conclusions are based on an assessment of the various accounting treatments and an evaluation of whether each treatment is appropriate for Joy's situation. (See Plaintiff's Exhibit 60 Sec. C).

Chang argues that such an analysis is analogous to *J.B. Hunt Transport* where testimony of an expert witness was excluded because the expert conceded that "he had insufficient information" to fully reconstruct the accident that was the subject of his analysis. *J.B. Hunt Transport, Inc. v. General Motors Corp.*, 243 F.3d 441 (8th Cir.2001). However, that case is clearly distinguishable from the case at bar. Here, Terpstra did not state that he had insufficient data to determine how to classify the transaction; rather, he stated that due to the presence of conflicting data he has given his professional opinion of the best way to record the transaction. Further, in *J.B. Hunt Transport,* the court found that the expert's testimony lacked scientific support and was therefore specu-

lative. *Id.* at 443. In contrast, Terpstra's opinion is based on his review of numerous financial documents including:

A) Joy's 1995 Balance Sheet which was completed immediately after the Young–Chang transaction and shows the transaction as a stock redemption;

B) Joy's 1995 Tax Return which shows a $1.8 Million stock redemption;

C) the loan commitment letter from Pioneer Bank to Young which states that the purpose of the loan was to fund the buyout of Chang's stock; and

D) the loan document which shows a modification to the security agreement between the Bank and Joy so that Joy could borrow funds to redeem its stock.

Chang complained that Terpstra's analysis was one-sided because he failed to consider the deposition testimony of attorneys for Young, which according to Chang shows that the transaction was a cross–purchase. However, such attacks are best suited for cross-examination. *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 145–46 (3rd Cir.2000) (test for admissibility is not whether expert could have done a better job, such issues are dealt with on cross).

For purposes of the *Daubert* standard, it was sufficient that Terpstra possessed the requisite skill to review the financial documents, that the documents relied on were of the type that an accountant would use to classify a transaction such as the one at issue in this case, that the testimony proffered by Terpstra was reasonable in light of the documents he proposed to testify about, and the proffered testimony aided in determination of an issue for trial. Those requirements were met and the testimony was therefore allowed.

*Trustee's Objections to Chang's Expert Schultz and Pinsky*

■ The Trustee sought to bar the testimony of two experts hired by Chang. A *Daubert* hearing was held to deal with those objections. James F. Schultz ("Schultz") is a Certified Public Accountant ("CPA") and Certified Valuation Analyst("CVA") who was asked to prepare a report on the valuation of Joy after the Young–Chang transaction. Schultz also challenged the valuation performed by Peltz as inaccurate. Kenneth S. Pinsky ("Pinsky") is a CPA with more than 27 years of experience who was asked to determine the proper accounting treatment of the Young–Chang transaction. The court reviewed the credentials of both Schultz and Pinsky and determined that both had adequate training, education, and experience to qualify as expert witnesses.

After the *Daubert* hearing, the court rejected the Trustee's assertion that Schultz's testimony should be barred because he had never testified in a bankruptcy case or because he was not published and had worked primarily as an estate tax consultant. None of those asserted objections are sufficient to bar testimony under *Daubert*. Moreover, the court reviewed the methodology employed by both professionals and determined that their opinions met the criteria of reliability discussed above.

Finally, as earlier discussed, the characterization of the transaction in issue was an essential element to be evaluated at trial. Viewing the transaction as one between Joy and Chang, then Chang had the burden of producing evidence to rebut the assertion that Joy was insolvent when the transaction occurred. *Matter of Taxman Clothing Co., Inc.*, 905 F.2d 166, 168 (7th Cir.1990) (defendant has initial burden to produce evidence that debtor was solvent in fraudulent conveyance action). Thus,

the opinions of Schultz and Pinsky passed the relevancy requirement.

## B. *The Litigation Issues*

### *The Trustee's Fraudulent Conveyance Claims under Illinois Law*

Counts I and II of the instant adversary charge a fraudulent transfer under 740 ILCS 160/5(a)(2) and 160/6(a), respectively. Section 544 of the Bankruptcy Code allows invocation of state fraudulent conveyance statutes to avoid a transfer that is voidable by creditors under state law. 11 U.S.C. § 544(b)(1).

### *Count I under § 160/5(a)(2)*

Section 740 ILCS 160/5(a)(2) provides the following:

5(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(2) without receiving a reasonably equivalent value[2] in exchange for the transfer or obligation, and the debtor

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that

he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5(a)(2).

This statute sounds in constructive fraud and is distinguishable from Section 160/5(a)(1) because it does not require a showing of intent to defraud. Rather, fraud is presumed if the debtor transfers property for less that adequate value and is thereby unable to meet its obligations. *Society of Lloyd's v. Collins,* 284 F.3d 727, 730 (7th Cir.2002). The Trustee must show three elements by a preponderance[3] of the evidence to meet its burden under Section 5(a)(2): (1) that Joy transferred property to Chang; (2) that the transfer was made for less than reasonably equivalent value; and (3) that as a result of the transfer, Joy was left with insufficient capital.

### *The Transfer to Chang*

The characterization of the transfer to Chang was identified as a critical issue for trial in this court's earlier Opinion. *See In re Joy Recovery Technology Corp.,* 257 B.R. at 267. According to the Trustee, the transfer was actually between Joy and Chang, with Young acting as a mere conduit through which $ 1.8 million flowed to Chang. Chang counters that there were three separate transactions, the first was a $1.8 million loan by Pioneer to Joy, followed by an equivalent loan from Joy to Young, and finally Young's $1.8 million purchase of Chang's stock. Hence, Chang contends that the transaction be-

---

**2.** 740 ILCS sets forth a definition for reasonably equivalent value that is not applicable to this case. It states: "For the purposes of paragraph (2) of subsection (a) of Section 5 and Section 6, a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the

acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement."740 ILCS 160/4(b).

**3.** *See Bay State Milling Co. v. Martin,* 145 B.R. 933, 946 (Bankr.N.D.Ill.1992) and cases cited (standard of proof is preponderance of evidence for constructive fraud).

tween him and Young was cross-purchase, not a stock redemption.

■ Courts will eschew appeals to form which obscure the substance of a transaction. Thus, a multilevel transaction will be collapsed and treated as a single transaction in order to determine if there was a fraudulent conveyance. *In re MFS/ Sun Life Trust–High Yield Series*, 910 F.Supp. 913, 934 (S.D.N.Y.1995). Here, Chang's witness Pinsky contended that the transaction was a cross-purchase because the documents exchanged between the parties stated that the transaction was a purchase by Young of Chang's stock. Moreover, Chang says he was unaware that Young secured the financing for the purchase with the assets of Joy.

■ It is true that the Stock Purchase Agreement and Letter–of–Intent signed by the parties showed that Young was buying Chang's stock. However, the issue before the court is not one of contract interpretation where the intent of the parties is paramount; rather, the issue is whether some need is shown to protect creditors from a transfer of Joy's assets for less than reasonable consideration, and therefore realty of the transaction is paramount. Improper transactions cannot be papered over and protected by agreement of the parties.

Notwithstanding documents of the parties, the transaction clearly fit the definition of a leveraged buyout ("LBO"). The essential characteristic of an LBO is that the target company's assets are used to finance the purchase of the company. Typically, the acquirer invests little if any equity, and the shareholders who are bought out are replaced by others as owners of the company, while the risk of insolvency formerly borne by the selling shareholders is shifted to the unsecured creditors because the company assumes heavier debt to fund the transaction. *In re Image Worldwide, Ltd.*, 139 F.3d 574, 580 (7th Cir.1998) Clearly, that is what happened here.

The entire purchase price of the transaction was funded by a new Pioneer loan to Joy. Young did not contribute any equity and the loan documents make clear that the lending bank was looking to Joy for its security. The guaranty given by Young was in large part illusory since his annual salary and total liquid assets were insufficient to pay the loan and cover interest on the loan. Likewise, the purported loan from Joy to Young was a fiction. There are no documents that show Young incurred any obligation to Joy as a result of the Young–Chang transaction. Young did not execute a promissory note or any loan documents for the $1.8 million. Rather, he was content to maintain on Joy's books the fiction of a $1.8 million obligation by him to Joy as long as he was ignorant of the resulting adverse tax consequence. Yet, when he was warned of the tax threat by his tax attorney, Marshall Brown, he promptly had that entry removed from Joy's financial statements and recast the transaction as a stock redemption. Therefore, Joy did not even have the benefit from Young of any loan commitment by him.

In substance, Joy paid its own purchase price to buy its stock for Young, and thereby incurred a $1.8 million obligation for the benefit of Chang. Thus, the first element of § 5(a)(2) of IUFTA was satisfied. For purposes, of this analysis it does not matter whether Chang was a direct or indirect beneficiary of the transfer from Joy. 11 U.S.C. § 101(54) ("transfer" defined as direct or indirect conveyance of property or interest). Nor does it matter whether he knew that Joy was the source of the funds used to buy his stock, since knowledge is not a requirement under the statute.

The reasoning of *Kupetz v. Wolf*, 845 F.2d 842, 847–48 (9th Cir.1988), cited by Chang is unpersuasive. *Kupetz* held that an LBO was not a fraudulent conveyance where the seller did not know that the transaction was being financed by an LBO. Such reasoning blurs the distinction between actual and constructive fraud. *See MFS/Sun Life Trust*, 910 F.Supp. at 936.

Finally, Chang did not dispute that he received a direct transfer of $300,000 from Joy in the form of a check for $200,000 for a "consulting agreement" and a further $100,000 under a "noncompete agreement." But Chang contends that Joy received reasonable equivalent value for those two transfers. Hence, the analysis will proceed to the second element under 740 ILCS 160/5(a)(2).

### Reasonable Equivalent Value

■ The issue of whether a debtor received reasonable equivalent value is a question of fact that must be evaluated as of the date of the transaction. *In re Mussa*, 215 B.R. 158, 172 (Bankr.N.D.Ill.1997). Courts will not look with hindsight at a transaction because such an approach could transform fraudulent conveyance law into an insurance policy for creditors. *In re O'Day Corporation*, 126 B.R. 370, 404–05(Bankr.D.Mass.1991). Unlike contract law, nominal consideration is inadequate to satisfy the reasonable equivalent value standard. *Leibowitz v. Parkway Bank & Trust Co.*, 139 F.3d 574, 580 (7th Cir.1998). Moreover, since the purpose of fraudulent conveyance law is to protect creditors, the determination of value is looked at from the vantage point of the debtor's creditors. *Id.* Thus, the inquiry focuses on what did the debtor give up and what did it receive that could benefit creditors. *Ohio Corrugating Co. v. Security Pac. Business Credit, Inc.*, 70 B.R. 920, 927 (Bankr.N.D.Ohio 1987).

■ However the transaction is viewed, Joy did not receive anything for the $1.8 million paid ultimately to Chang— no treasury stock, and no loan commitment. As discussed above, there was no loan agreement between Joy and Young. Nor can the transaction be viewed as a stock redemption. There was no evidence that Joy received any treasury stock as result of the Young–Chang transaction. Moreover, stock redemptions are treated as dividends to shareholders which return no value to the company. *Vadnais Lumber Supply, Inc. v. Byrne*, 100 B.R. 127, 136 (Bankr.D.Mass.1989). Thus, whether viewed as an LBO or characterized otherwise, Joy did not receive reasonably equivalent value for the $1.8 million transfer to Chang.

■ The same holds for the checks issued to Chang under the noncompete and consulting agreements. As the opinion in *Vadnais* pointed out, noncompete agreements are valueless to creditors because it leaves them in the same place they occupied before the transaction. *Id.* Prior to the transaction, Chang owed a fiduciary duty to Joy not to compete with it. After the transaction, Joy had the same promise, except it cost the company $100,000. As for the consulting agreement, Chang cannot have it both ways. Chang testified that he was seriously impaired as a result of carbon monoxide poisoning after he returned from China, which required him to take a leave of absence and to rely on his brother-in-law to communicate with others at Joy. Young testified that Chang could no longer function in his job. Further, both parties agreed in a letter agreement that Chang would not participate in day-to-day operations of Joy pending the closing of the transactions in issue here. Thus, Chang's protestation at trial that he was ready, willing, and able to perform under the "consulting agreement" rings

hollow. Indeed, he admitted that he is still suffering serious impairment as a result of his illness. Finally, from the creditor's perspective, even if Chang had consulted with Joy, the company would not gain anything that it did not have prior to Chang's illness. Thus, it is clear that Joy did not receive reasonably equivalent value for any of the payments transferred to Chang.

### Inadequate Capital

■■■■ The test under 740 ILCS 160/5(a)(2) for whether a company had adequate capital after a contested transfer to fund its operations is not the same as that for insolvency. *Vadnais,* 100 B.R. at 137. Rather, unreasonably small capital means something more than insolvency or inability to pay debts as they come due. Being left without adequate capital would mean that the transaction in issue put Joy on the road to ruin. *Id.* To sustain his burden, the Trustee must show something more than a deteriorated balance sheet after the LBO or that Joy had difficulty paying its trade creditors. This he has not done.

■■■■ Peltz reviewed Joy's financial data both before and after the LBO and concluded that Joy's trade payables deteriorated substantially, as did its working capital ratios. Working capital is the difference between a company's current assets and current liabilities. A low level of working capital means that the company will have difficulty funding its operations. Schultz conceded that Joy's working capital declined by 50% after the LBO and the current ratio (the ratio of current assets to liabilities), declined by 30%. Thus, there is no doubt that the LBO significantly "increased the risk" to Joy's creditors as claimed by Peltz. However, reducing the test for "unreasonably small capital" to such a showing would likely mean that any LBO would be a fraudulent

conveyance. As stated above, the goal of fraudulent conveyance law is not to provide an insurance policy against business risk for creditors. Rather, the court must balance the need to protect creditors from transactions that cripple a company with the need to preserve the market for a debtor's assets.

■■■■ In this case, after the LBO, Joy compared favorably with other companies in its industry in terms of its working capital. As Schultz testified, Joy post-LBO was still in the top 60% of firms in its market and Joy's 1994 cash flow was almost twice the amount needed to finance the Pioneer loan. (See Schultz Exhibit 66 p. 15). Moreover, Joy had a $1.5 million credit line at Pioneer after the close of the LBO, and the Trustee did not refute the fact that the company had additional borrowing capacity, as testified by Schultz. Further, courts will not find that a company had unreasonably low capital if the company survives for an extended period after the subject transaction as Joy did. *See Moody v. Security Pacific Business Credit,* 971 F.2d 1056, 1074 (3rd Cir.1992) (no unreasonably low capital where creditors paid for twelve months after transaction); *MFS/Sun Life Trust–High,* 910 F.Supp. at 944 (same where company was viable for eight months after LBO); *In re Ohio Corrugating Company,* 91 B.R. 430, 440 (Bankr.N.D.Ohio 1988) (same creditors paid for ten months); *Credit Managers Ass'n of Southern California v. Federal Co.,* 629 F.Supp. 175, 184 (C.D.Cal.1985) (twelve months); Cf. *In re O'Day,* 126 B.R. at 407–08 (trade creditors not being paid despite line of credit); *Vadnais,* 100 B.R. at 138 (trade creditors not being paid before and after LBO).

### Conclusion as to Count I

Pursuant to the foregoing discussion, judgment will enter on Count I in favor of

defendants because the Trustee has failed to show that Joy lacked reasonably sufficient capital to fund its operations after the LBO, and therefore did not meet one prong of the test under Section 5(a)(2) of IUFTA.

*Count II under 740 ILCS 160/6(a)*

Count II charges that the LBO was a fraudulent conveyance under 740 ILCS 160/6(a) of the IUFTA. Section 6(a) provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

740 ILCS 160/6(a).

The elements to be established under that provision are: (1) that a transfer was made from Joy to Chang; (2) that the transfer was made for less than reasonably equivalent value; and (3) that at the time of the transfer, Joy was insolvent or was made insolvent.

The first two elements of Section 160/6(a) are the same as those of Section 160/5(a)(2). The key difference between the two statutes is that it focuses on creditor claims before the alleged fraudulent conveyance. Inquiry under section 6(a) is whether the transaction was made while the debtor was insolvent or whether the debtor was made insolvent as a result thereof. "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." 740 ILCS 160/3(a). This is the so-called balance sheet test for insolvency, which is the same under the Bankruptcy Code. 11 U.S.C. § 101(32).

Analysis as to the first two elements under § 160/6(a) is the same as earlier discussed as to Count I, and the parties agree that Joy was solvent prior to the LBO. The remaining issue is whether the LBO made Joy insolvent.

■■■ The first step in this analysis is to determine whether valuation should be on a fair market or liquidation basis. Fair market value is defined as the value that a willing buyer would pay for the assets as a going concern. The general rule is that the fair market value should be used to value assets unless the company is on its deathbed. *MFS/Sun Life Trust,* 910 F.Supp. at 939; *Vadnais Lumber,* 100 B.R. at 131–32. Here, both parties agree that Joy was solvent prior to the transaction. Though the firm was seriously weakened by the expected loss of a major account and other problems, there is no evidence that the company was facing its imminent demise when the transaction at issue occurred. The company had grown over 40% in the previous five years and continued to generate enough capital to finance its debt load. In light of that history, the appropriate valuation method is fair market value. Therefore, the court will not credit the liquidation analysis performed by Peltz on behalf of the Trustee.

Both expert witnesses capitalized projected income to derive the present value that a putative buyer would pay for Joy. Both used the weighted average cost of capital ("WACC") method to determine the discount rate at which the assets were capitalized. The WACC consists of two components, debt and equity. The debt component reflects the tax adjusted cost of debt weighted by the proportion of debt in the firm's capital structure. The similarly weighted equity component shows the cost of equity after adjustment for the risk of investment relative to the rate of return of

a risk-free investment and the general rate of return for comparable equity investments. Once the discount rate was determined, it was then capitalized by adjusting for the expected growth rate of the business. Finally, the cap rate was then applied to the income stream to derive the amount a putative buyer would pay to realize the projected income, as adjusted for the buyer's opportunity cost and the risk of the investment. The parties performed the following calculations to determine Joy's value as a going concern:

By Schultz (1 + growth rate) (income)–(long–term debt) = Equity Value cap rate (growth rate-discount rate)

By Peltz (1 + growth rate) (income)–(long-term + Short–term debt) = Enterprise Value cap rate (growth rate-discount rate)

After applying his formula, Peltz concluded that Joy had a so-called enterprise value of $2.345 million against liabilities of between $3.714 million and $3.988 million. Therefore, he found that Joy was insolvent after the LBO to the extent of between $1.369 million and $1.643 million.

According to Schultz, Peltz made numerous errors in his calculations, which resulted in a false finding of insolvency. For example, Schultz contends that the cap rate used by Peltz was too high because Peltz used a specific company risk factor of 10%, instead of the 2% rate used by Schultz. And Peltz allegedly improperly weighted the debt and equity components in his analysis by using a debt to equity ration of 2 to 1. Thus, Peltz applied a cap rate of 17% versus 11.1% used by Schultz. Therefore, Schultz contends that these two differences alone resulted in a $1.2 million reduction in Joy's value in Peltz's calculation. Peltz is also said to have understated the base income stream by $190,000 per year, which would increase Joy's value by $1.7 million using Schultz's cap rate of 11.1%. Peltz is also accused of improperly utilizing the valuation formula by including short-term debt in the debt variable of the formula. Schultz argues that only long-term debt should be deducted to derive the equity value because short-term debt is assumed to be paid on an ongoing basis. Finally, Schultz asserts that Peltz erred by not adding in the alleged $1.8 million receivable from Young (the receivable originally put on the Joy books, but later reported by Young and Joy) as a nonoperating asset.

Although some of these criticisms have arguable merit, the problem for Chang is that even if the court takes the capitalized earnings number used by Schultz, Joy was made insolvent by the LBO. Indeed, Schultz stated that the equity value of Joy was $2,669,530 after the LBO. (See Chang Expert Exhibit 64 pg. 28). However, Joy had liabilities between $3.714 and $3.988 million (Schultz letter at Exhibit 66 pg. 1). Therefore, applying the balance sheet test for insolvency shows that the company was insolvent by more than $1 million even using Schultz's analysis. The picture is even worse if Schultz's overly optimistic cap rate is adjusted upwards.

Chang does not fare any better under the second solvency test performed by Schultz employing the market multiple approach. Under that approach, Schultz took Joy's earnings before taxes, depreciation, and amortization ("EBITDA") and multiplied it by 4.5 to derive the value of Joy's assets after the LBO.[4] That number

---

4. The amounts for depreciation and amortization, which were taken out to derive EBITDA, are added back into EBITDA along with nonrecurring costs such as the $125,000 saved by eliminating Chang's salary and $166,968 in expenses related to the LBO and the total amount is multiplied by 4.5 to derive Joy's market valuation (EBITDA + Depreciation +

was then reduced by subtracting the long-term debt to reach what Schultz called the company's "net worth." It is inappropriate to use a term that implies a balance sheet analysis to a projected income stream, since doing so connotes a false sense of precision. Further, the court is troubled by the way that the multiplier of 4.5 was chosen. Schultz reviewed a single sales transaction involving a firm (Anglo Metals) which sold for four times its EBITDA and data supplied by another firm (Metals Management) which was not comparable to Joy to derive its multiplier. As stated in the treatise relied on by Schultz, "a single transaction does not a market make." (See Valuing a Business Shannon P. Pratt, et al. p. 233 discussing Estate of Joyce C. Hall, 92 T.C. No. 19.) There should be at least several relevant transactions before a useful comparison can be made. *Id.* at 262. Therefore, Schultz's calculation of four to seven times EBITDA as the range of valuation for a business comparable to Joy is of questionable value since the history as to Metals Management, which provided him that number, never purchased any companies in the relevant market.

■ Even putting aside these concerns, the valuation reached by Schultz in employing this method still showed Joy was insolvent. (See Chang Exhibit 66 pg. 13). Schultz averaged the valuations for 1994 and 1995 using this method to derive a valuation of $5.1 million. Deduction by him of long-term debt of more than $2.6 million results in a valuation of $2.4 mil-lion, which is insufficient to offset liabilities in excess of $3 million.[5] The only way that Joy could be found solvent after the LBO would be to count as entirely valid the so-called $1.8 million "receivable" from Young and add it to the valuation as a nonoperating asset, therefore raising Joy's fair market value to $4.2 million. However, as stated above, the Young receivable was mostly illusory. Even if Young had given a note to Joy for that amount—which he did not—it would not have constituted a $1.8 million asset for Joy since the likelihood that Young could have fully repaid the loan was small. *See United States v. Gleneagles, Investment Co., Inc.,* 565 F.Supp. 556, 575 (M.D.Pa.1983) (court refuses to credit note given in LBO where promissor was unable to pay loan). Schultz testified that Young would have to earn between $700,000 and $800,000 in salary and bonus to finance the loan. At the time of the transaction, Young earned a $150,000 in salary and had liquid assets of $364,000. (See Exhibit 4 Personal Financial Statement for Nick Young). Thus, it is appropriate to credit any putative Young "receivable" at no more than $400,000. This would increase the total invested capital value of Joy to $5.7 million.

However, deducting the long-term debt of $2.6 million would render a valuation of $3.1 million versus total liabilities between $3.7 and $3.9 million. Hence, Joy would still be insolvent. (See Chang Exhibit 64 pg. 28, sub-exhibit D). In light of the forgoing, the LBO was a fraudulent conveyance under 740 ILCS 160/6(a).

Amortization + Nonrecurring Cost × 4.5 = Market Valuation).

5. This is the same method and numbers used by Schultz to calculate the "Stockholders' Equity Value" shown in Chang's Exhibit 66 at page 13. However, unlike Schultz, the court does not credit the $1.8 million receivable from Young. Thus, instead of a total invested capital value of $6.9 million as derived by Schultz ($5.1 million + $1.8 million), the value of invested capital is calculated by the court to be $5.1 million ($6.9 million less $1.8 million). Hence, Joy's value after the LBO (total invested capital-long term debt) was $2.4 million as opposed to the $4.2 million figure shown by Schultz.

*Chang was Transferee under § 550*

Having concluded that Chang received a fraudulent conveyance as pleaded in Count II, the next step is to determine if he was an initial transferee as defined by 11 U.S.C. § 550(a), so as to make him liable for turnover of the funds received. The statute states:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544 ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from-
>
> > (1) the initial transferee or such transfer or the entity for whose benefit such transfer was made; or
> >
> > (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

■■■■■ A panel of the Seventh Circuit has determined that a party that holds the property "only for the purpose of fulfilling an instruction to make the [property] available to someone else is not a transferee, but an intermediary." *Bonded Fin. Services, Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir.1988). Intermediaries cannot be held responsible for such transfers because to do so would inevitably result in the creation of precautionary processes that would burden the efficiency of transactions. *Id.* A transferee is the party that has dominion over the money or other asset, and has the right to put the money to his own purposes. *Id.*

■■■ Here, the evidence is clear that Young was merely a conduit through which the $1.8 million was transferred to Chang. The Young–Chang transaction was a classic LBO where the buyer of the stock obtained a loan that was secured against the assets of the target and the loan proceeds were funneled through an-

other entity to the seller. *See Gleneagles*, 565 F.Supp. at 575 (money passed through holding company to selling shareholders). Young never had control over the money because the loan documents made it clear that the loan was intended for the express purpose of buying Chang's stock. (See Exhibit 18, 34(a)). Young understood this; that is why he was surprised that the $1.8 million check was made payable to him. Testimony at trial showed that the sole purpose for making Young the payee on the check was to be able to facilitate the redeposit of the funds if the transaction did not close. Mere receipt of the check was insufficient to make Young a transferee under the authority in the Circuit. *Bonded Fin.*, 838 F.2d at 893. Indeed, Young immediately signed the check over to Chang who then deposited it into his account. The bank subsequently honored the draft and Chang exercised unfettered control over the funds. Therefore, the evidence is clear that Chang was the initial transferee of the funds.

*Chang not Protected by § 550(b)(1)*

■■■ Under § 550 of the Bankruptcy Code, "The trustee may not recover under section (a)(2) of this section from ... a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided."

The Code does not define good faith. However, courts have found a lack of good faith where the circumstances showed that the transferee either knew or should have known about a debtor's poor financial condition or where the transferee gave less than reasonable equivalent value for the benefit received. Collier on Bankruptcy, ¶ 550.03[2] (listing cases). The knowledge requirement of § 550(b)(1) is based on an objective test as to whether the transferee

should be charged with knowledge of the voidability of a transaction:

> If a transferee possesses knowledge of facts that suggest a transfer may be fraudulent, and further inquiry would reveal facts sufficient to alert him that the property is recoverable, he cannot sit on his heels, thereby preventing a finding that he has knowledge. In such a situation, the transferee is held to have knowledge of the voidability of the transfer.

*Brown v. Third Nat'l Bank,* 67 F.3d 1348, 1357 (8th Cir.1995).

Chang is not eligible for the protection under the safe-harbor provision of § 550(b)(1). To qualify as a good faith transferee, Chang would have had to taken the funds for "value" and without knowledge of the voidability for the transfer. 11 U.S.C. § 550(b)(1). As discussed above, Chang did not give any value for the transfer. Secondly, as an officer of Joy, Chang had inquiry notice that the transaction could be avoided. Chang did not show that he was too ill or enfeebled when the LBO took place to know what was transpiring. Chang knew that Joy had changed banks from LaSalle to Pioneer. The checks were drawn against a Pioneer account and the words "Loan Department" appeared on the face of the checks. A reasonable person acting in good faith would have been on notice that Joy was a borrower and the possible source of the funds. *See Bonded Fin.,* 838 F.2d at 898–99 (failure to investigate under circumstances which would cause a reasonable person to investigate can show lack of good faith). Chang's claim that he and his counsel were misled by Young and had no idea that Joy was the source of the money to buy his stock is simply not credible.

### Counts III and v. Breach of Fiduciary Duty

■ This court's earlier Memorandum Opinion established that the Trustee had standing to sue Chang for breach of his fiduciary duty to Joy. *Joy Recovery Technology,* 257 B.R. at 273. The earlier Opinion also found that Joy was a closely held corporation and that Chang owed a fiduciary duty to the corporation and its shareholders. *Id.* at 274. The Trustee avers that as an officer of an insolvent corporation, Chang also owed a fiduciary duty to Joy's creditors. "This fiduciary duty extends to the creditors of corporations that are in the vicinity of insolvency." (See Trustee's Proposed Findings of Fact and Conclusions of Law ¶ 290). The general rule is that directors and officers do not owe a fiduciary duty to creditors of a corporation, except under special circumstances such as when the corporation is insolvent. *Technic Engineering, Limited v. Basic Envirotech, Inc.,* 53 F.Supp.2d 1007, 1010–11 (N.D.Ill.1999). From the moment a corporation becomes insolvent, its assets are deemed to be held in trust for the benefit of creditors. *Id.* The rationale for this view is that directors of an insolvent corporation have special knowledge that is unknown to creditors. However, there is an issue whether that rationale applies under Illinois law when the transaction itself caused the debtor to become insolvent, as happened in this case.

■ Although, this court in *In re Aluminum Mills Corp.,* 132 B.R. 869, 891 (Bankr.N.D.Ill.1991), opined that the fiduciary duty owed by directors of a corporation may protect creditors when a transaction undertaken by the corporation at direction of its officer leads to insolvency, that view has been criticized as overly broad by the District Judge ruling in *Technic Engineering. Technic Engineering,* 53 F.Supp.2d at 1010 Fn. 4. At present the Illinois Supreme Court has not resolved this issue. However, for reasons set forth in *Aluminum Mills,* the conduct

of Chang in effectuating the transaction involved here, stripping the corporation of assets without benefit to it and rendering it insolvent, is found to have violated his fiduciary duty. Accordingly, judgment will enter against him on Counts III and V.

*Count IV Misappropriation*
*805 ILCS 5/8.60*

Illinois corporation law provides:

S 8.60. Director conflict of interest. (a) If a transaction is fair to a corporation at the time it is authorized, approved, or ratified, the fact that a director of the corporation is directly or indirectly a party to the transaction is not grounds for invalidating the transaction or the director's vote regarding the transaction; provided, however, that in a proceeding contesting the validity of such a transaction, the person asserting validity has the burden of proving fairness unless:

> (1) the material facts of the transaction and the director's interest or relationship were disclosed or known to the board of directors or a committee of the board and the board or committee authorized, approved or ratified the transaction by the affirmative votes of a majority of disinterested directors, even though the disinterested directors be less than a quorum; or
> (2) the material facts of the transaction and the director's interest or relationship were disclosed or known to the shareholders entitled to vote and they authorized, approved or ratified the transaction without counting the vote of any shareholder who is an interested director.
>
> (b) For purposes of this Section, a director is "indirectly" a party to a transaction if the other party to the

transaction is an entity in which the director has a material financial interest or of which the director is an officer, director or general partner.

805 ILCS 5/8.60.

The goal of damages under this statute is not compensatory; rather, the purpose is to deprive the fiduciary of the benefit of his breach, and thereby to deter fiduciaries from breaching their duty to the corporation. *Levy v. Markal Sales Corp.*, 268 Ill.App.3d 355, 205 Ill.Dec. 599, 643 N.E.2d 1206, 1220 (1994) (citation omitted). Thus, forfeiture of the value he or she obtained is allowed under the cited provision.

■ Section 5/8.60 provides that a director or officer who receives personal benefit from a transaction with the corporation must show that the transaction was "fair" to the corporation. *Olsen v. Floit*, 219 F.3d 655, 657 (7th Cir.2000). Fairness is presumed if the transaction is approved by a majority of disinterested directors or shareholders acting with full knowledge of the material facts of the transaction. 805 ILCS 5/8.60(1)-(2). Otherwise, Illinois law defines fairness as market value. *Olsen*, 219 F.3d at 657. "A transaction is 'fair' to a corporation when it receives at least what it would have obtained following arms' length bargaining in competitive markets." *Id.* (citation omitted). This standard cannot be met by a leveraged buyout where the corporation receives nothing for its commitment to finance the purchase of a business for another entity. *See MFS/Sun Life Trust*, 910 F.Supp. at 937 (unlikely that any LBO can satisfy fair consideration requirement). However, parties can still engage in LBO's without running afoul of § 5/8.60 by obtaining the necessary approval of disinterested directors or shareholders after fully disclosing the transaction.

■ That is what Chang contends occurred here. Chang argues that Young's acceptance of the transaction meant that it was fair to Joy since Young was the co-owner of the company. However, there are two problems with this argument. First, it assumes that Joy was the alter-ego of Young. It is settled law that a corporation is a separate legal entity, and as stated above the Trustee had standing to challenge any transaction that could be attacked by Joy, notwithstanding the fact that transaction may have been ratified by Young. *In re Rehabilitation of Centaur Insurance Co.*, 158 Ill.2d 166, 198 Ill.Dec. 404, 632 N.E.2d 1015, 1017 (1994); *Joy Recovery Technology*, 257 B.R. at 273. Next, as was stated in the earlier Opinion herein, Young was not a disinterested party. *Id.* at 275. The Illinois statute requires ratification by a disinterested shareholder for the safe harbor provision to apply. 805 ILCS 5/8.60(2) (vote of shareholder who is an interested director does not count). That did not happen. Thus, having concluded that Chang engaged in a constructively fraudulent transaction with Joy, it necessarily follows that he violated the strictures of Section 5/8.60. Judgment will therefore enter against Chang on Count IV.

## C. *Subordination of Chang's Claim*

The Trustee may subordinate Chang's claim against Joy under § 510 of the Code. "Section 510 was created in the 1978 Code as a codification of long-standing case law empowering the bankruptcy courts to subordinate any valid claim against the bankruptcy estate 'when principles of equity would be offended by the allowance of such claims on a parity with those of other creditors.'" *Koch Refining v. Farmers Union Central Exchange*, 831 F.2d 1339, 1350 (7th Cir.1987) (citation omitted). Section 510(c) provides:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c).

■ At one point, Congress considered a categorical subordination of all claims of directors, officers, or affiliates of the debtor. Collier, *supra* ¶ 510.05[1][a]. But such a provision would have increased the number of bankruptcies by discouraging insiders from investing in ailing business. *Id.* at ¶ 510.05[3][c]. Thus, that provision was dropped and Section 510 eschews statutorily defined grounds for subordination in favor of "equitable" grounds. *Id.* at ¶ 510.05[1][a]. Congress left it to the courts to develop the "principles of equitable subordination." *Matter of Envirodyne Industries, Inc.*, 79 F.3d 579, 581 (7th Cir.1996). However, courts are not given license to legislate entire new categories of subordinate claims; rather, the determination of whether to subordinate a particular claim is a factual inquiry that must be made on a case-by-case basis. *Matter of Lifschultz Fast Freight*, 132 F.3d 339, 348 n. 7 (7th Cir.1997) (no categorical subordination of tax penalty); *Envirodyne*, 79 F.3d at 581 (Section 510(c) inquiry is done on case-by-case basis focusing on fairness to other creditors).

■ In the Seventh Circuit, the test from *Matter of Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir.1977) has been adopted to determine if a claim should be equitably subordinated. *Lifschultz*, 132 F.3d at 344. Under the *Mobile Steel* test, a claim will

be reprioritized by subordinating it to other claims where: (1) the claimant has engaged in some type of inequitable conduct; (2) The claimant's misconduct has resulted in some injury to creditors; and (3) the equitable subordination of the claim is consistent with the Bankruptcy Code. *Id.* The misconduct required for the first element need not be related to the claim, and any subordination allowed should be proportionate to the claimant's wrongdoing. *Mobile Steel,* 563 F.2d at 700–01. For example, if the claimant has two claims for $10,000 each and has defrauded the debtor out of $10,000, then the court should only subordinate one of the $10,000 claims. *Id.*

■ The Supreme Court has not yet passed on whether inequitable conduct is a mandatory requirement before a claim can be equitably subordinated. *United States v. Noland,* 517 U.S. 535, 543, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996). But the rule under *Lifschultz* is that inequitable conduct is generally required before a claim will be subject to subordination. *Lifschultz,* 132 F.3d at 349. However, that rule is not absolute. See *In re Virtual Network Servs. Corp.,* 902 F.2d 1246, 1250 (7th Cir.1990) (subordination without misconduct); *Envirodyne,* 79 F.3d at 581 (same). Three categories of claims have been subordinated under the *Mobile Steel* test; "(1) when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; (2) when a third party controls the debtor to the disadvantage of other creditors; and (3) when a third party actually defrauds other creditors." *Matter of United States Abatement Corp.,* 39 F.3d 556, 561 (5th Cir.1994).

■ Here, Chang obviously misused his position as a fiduciary to the detriment of Joy's creditors. Beginning in early 1995, Chang contributed to the deadlock of Joy's board, and ultimately he orchestrated the dismantling of the board by intimidating its members with threats of litiga-tion, which eventually led those members to resign. Thus, creditors of Joy were left without the protection afforded by the corporate form. Once the board was dispatched, Chang and Young used Joy as a mere instrumentality to effect the buyout of Chang's stock. There was no board resolution approving the LBO, and Joy was not even represented by counsel when it mortgaged its future to finance the LBO. Joy's creditors were left holding the bag after Chang cashed-out his equity in the corporation. *See Lifschultz,* 132 F.3d at 344 (claimant's use of debtor as mere instrumentality is basis for equitable subordination). The distribution to Chang came at expense of the company's unsecured creditors. Finally, the harm caused to the unsecured creditors far exceeds Chang's asserted claim. Thus, in light of the foregoing, equity commands that Chang's claim should be fully subordinated to the claims of those creditors.

### CONCLUSION

Judgments will issue by separate Orders in accord with the foregoing rulings.